INCORPORATED TOWN OF SIBLEY, Appellant, v. OCHEYEDAN ELECTRIC COMPANY, Appellee.

**MUNICIPAL CORPORATIONS: Contracts in General—Bound by Quasi**
**1  Private Contract.** A city or town owning its own electric light and power plant may, under Sec. 724, Code Supp., 1913, validly contract

to furnish, at its corporate limits, electric light and power for a stated time and at a stated rate to a private corporation located and doing business wholly outside the corporate limits of the city or town, and may not thereafter, by ordinance or otherwise, change said contract in its schedule of rates, without the consent of said private corporation.

EVANS, PRESTON, and DE GRAFF, JJ., dissent.

APPEAL AND ERROR: Entry of Judgment—Inadvertent Omission in
2  Trial Court. An inadvertent omission to enter in the trial court a judgment to which appellant was always concededly entitled, may be rectified in the appellate court, or in the trial court under proper authorization of the appellate court, and that, too, without the allowance of costs to appellant.

*Appeal from Osceola District Court.*—C. C. BRADLEY, Judge.

APRIL 8, 1922.

REHEARING DENIED DECEMBER 15, 1922.

ACTION at law, to recover an amount claimed to be due for electric energy furnished to the defendant by the plaintiff city. There was a contract between the parties, fixing the rate at which such energy was to be furnished. The city, by ordinance, changed said rate. The action is to recover the amount claimed to be due at the increased rate. Plaintiff was denied the relief sought, and prosecutes this appeal.—*Affirmed.*

*Clark, Dwinell & Meltzer,* for appellant.

*Francis & Owen,* for appellee.

FAVILLE, J.—The appellant is an incorporated town, organized as a municipality under the laws of this state. The appellee is a private corporation, engaged in the business of distributing

1. MUNICIPAL
CORPORATIONS:
contracts in
general: bound
by quasi private
contract.

electric energy to the citizens of the town of Ocheyedan. It appears from the record that, sometime prior to the 14th of July, 1914, the appellant, by proper proceedings under the statutes of this state, established and constructed in said mu-

nicipality a municipally owned electric light plant. It also appears that the incorporated towns of Ocheyedan, Harris, and Lake Park, lying some distance from Sibley, desired to obtain electric current from the said municipal plant at Sibley, for distribution to the inhabitants of the said three towns. In contemplation of supplying electric current for said outlying towns, it appears that the town of Sibley constructed the said electric light plant of larger capacity than would have been necessary for the distribution of electric current to the inhabitants of the said town of Sibley.

On or about the said 14th day of July, 1914, a written contract was duly entered into between the said incorporated town of Sibley and the appellee and the said incorporated towns of Harris and Lake Park, for the furnishing of electric current to said parties. The only party concerned in this case as appellee is the Ocheyedan Electric Company. The said contract provided that the town of Sibley should furnish electric current under the said contract for a period of twenty years from the date when current was first used under the said contract. It was provided by said contract that the said electric current "shall be metered by the incorporated town of Sibley, Osceola County, Iowa, at the present corporate limits." The said contract fixed the rate at which said electric current was to be furnished, and provided:

"This contract to furnish electricity at the rate hereinbefore specified and for the purposes hereinbefore specified, shall be continued for the full period of twenty years as hereinbefore specified."

In pursuance of said contract, electric current was furnished by the appellant to the appellee at the corporate limits of the town of Sibley, at which point the said current was taken upon a transmission line constructed by the appellee and carried for distribution to the town of Ocheyedan, as contemplated and provided in said contract. The rate fixed by the said contract was paid by the appellee and accepted by the appellant until on or about the 7th day of August, 1919, at which time the appellant adopted a city ordinance by which specific reference is made to the said contract of July 14, 1914, with the appellee, which said ordinance recited that:

"Whereas, at the time of entering into the aforementioned contracts the rate to be paid for such electric energy or current by second party was agreed upon and expressly stipulated in such contract, and whereas, the cost of producing such electric energy or current has materially increased since the dates of said several contracts, now therefore, it is hereby ordained by the council of the incorporated town of Sibley, Iowa (Section 1) that the rate for electric energy or current to be paid to said town of Sibley, by second parties under and by virtue of the terms of the aforementioned contracts, and the rate to be paid by any other town or towns similarly situated and under similar contracts which may hereafter be entered into, shall be as follows, to wit:"

Then follows a schedule fixing a substantially higher rate than was provided for in said contract.

The question for our determination in this case is whether or not the appellant has the power, under the facts disclosed, to adopt, without the consent of the appellee, said ordinance increasing the rates as fixed by the said contract, and to recover from the appellee this increased rate.

I. It is a well recognized and generally established rule that municipalities have two classes of power: one legislative, public, and governmental; the other, proprietary and quasi private. Under the former, the municipality acts as a sovereignty, and governs and controls the inhabitants of the municipality. Under the latter, the municipality acts for the private advantage of the inhabitants of the city, and to a certain extent, for the city itself. The two powers are clearly separate and distinct, and the functions of the municipality in its legislative or governmental capacity should not be confused with its functions in its proprietary capacity. These general rules are well established, and have been recognized by us. *First Nat. Bank v. City of Emmetsburg,* 157 Iowa 555; *Illinois Tr. & Sav. Bank v. City of Arkansas City,* 76 Fed. 271; *Esberg Cigar Co. v. City of Portland,* 34 Ore. 282 (55 Pac. 961); *City of Winona v. Botzet,* 169 Fed. 321; *City of Henderson v. Young,* 119 Ky. 224 (83 S. W. 583); *Eaton v. City of Weiser,* 12 Idaho 544 (86 Pac. 541); *City of South Pasadena v. Pasadena Land & Water Co.,* 152 Cal. 579 (93 Pac. 490); *Davoust v. City of Alameda,*

149 Cal. 69 (84 Pac. 760); *Marin Water & Power Co. v. Town of Sausalito,* 168 Cal. 587 (143 Pac· 767); *Pikes .Peak Power Co. v. City of Colorado Springs,* 105 Fed. 1. ,

The legislature of this state has conferred upon cities and towns the power to act in a proprietary capacity in respect to the establishment, maintenance, and operation of electric light plants. Said authority is found in Section 720, Code Supplement of 1913, and is as follows:

"They [cities and towns] shall have power to purchase, establish, erect, maintain and operate, within or without the corporate limits of any city or town, heating plants, waterworks, gasworks, or electric light or electric power plants, with all the necessary reservoirs, mains, filters, streams, trenches, pipes, drains, poles, wires, burners, machinery, apparatus and other requisites of said works or plants, and lease or sell the same."

Section 724, Code Supplement, 1913, is as follows:

"They shall have power, when operating such works or plants, and shall have the power to sell the products of such municipal heating plants, waterworks, gasworks or electric light or electric power plants, to any. municipality, individual or private corporations outside of the city or town limits as well as to individuals or corporations within its limits, and to erect in the public highway the necessary poles upon which to construct transmission lines, and to assess from time to time, in such manner as they shall deem equitable, upon each tenement or other place supplied with water, gas, heat, light or power, reasonable rents or rates fixed by ordinance, and to levy a tax, as hereafter provided, to pay or aid in paying the expenses of running, operating, renewing, extending and repairing such works or plants owned and operated by such city or town, and the interest on any bonds issued to pay all or any part of the cost of their construction."

It must be conceded that this statute is not a model· of lucidity and coherence.

Acting under these sections, the appellant established its municipal plant and made a contract to sell the products of such plant to the appellee, a private corporation outside the city or town limits. It is contended by the appellant that, under said Section 724, the power conferred upon the municipality to sell

electric current to a private corporation outside the town limits was, by said section, coupled with the limitation that the city council should "assess from time to time, in such manner as they shall deem equitable, upon each tenement or other place supplied with water, gas, heat, light or power, reasonable rents or rates fixed by ordinance, and to levy a tax" to pay the expenses of the plant.

The literal language of the section does provide that the municipality, when operating its own plant, shall have the power to sell the product to private corporations outside of the city limits. It also provides that the city shall have the power to "assess from time to time, in such manner as it shall deem equitable, upon each tenement or other place supplied with water, gas, heat, light or power, reasonable rents or rates fixed by ordinance, and to levy a tax."

It is the appellant's contention that the words "other place," used in this section, are broad enough to include the "place" at the corporate limits where the electric current was delivered through meter to the transmission lines of the appellee, the private corporation outside of the city limits; and it is appellant's contention that, under said section, the city council has the right, by ordinance, to fix the rates for such current so delivered at such place.

At the outset, it must be conceded that, unless expressly conferred by the legislature, a city council has no extraterritorial powers in the exercise of its legislative or governmental functions. A municipality exercises its legislative and governmental powers by the enactment of ordinances and the enforcement of the same. It can, by ordinance, act only within its territorial limits, unless expressly authorized by statute to do otherwise. *Gosselink v. Campbell,* 4 Iowa 296, 299; *Marin Water & Power Co. v. Town of Sausalito,* supra; *City of South Pasadena v. Los Angeles Terminal R. Co.,* 109 Cal. 315 (41 Pac. 1093); *Southwestern Tel. & T. Co. v. City of Dallas,* (Tex. Civ. App.) 131 S. W. 80; *Jones v. Hines,* 157 Ala. 624 (47 So. 739); *Borough of Gettysburg v. Zeigler,* 2 Pa. Co. Ct. 326; *Farwell v. City of Seattle,* 43 Wash. 141 (86 Pac. 217); *Donable's Admr. v. Town of Harrisonburg,* 104 Va. 533 (52 S. E. 174).

But a municipality may contract in its proprietary ca-

pacity in regard to matters and things entirely outside of its corporate limits. This is essential to the life of the municipality. It may buy for the use of the municipality in the open market, in accordance with its needs, and make binding and enforcible contracts for such purchases. It also may sell, in the world at large, such commodities belonging to the municipality as it may legally have a right and authority to sell. It is governed, in its proprietary capacity, by the same rules that govern private individuals 'or corporations. *City of Henderson v. Young*, supra; *Illinois Tr. & Sav. Bank v. City of Arkansas City*, supra; *San Francisco Gas Co. v. City of San Francisco*, 9 Cal. 453; *Wagner v. City of Rock Island*, 146 Ill. 139; *City of Vincennes v. Citizens' Gas Light Co.*, 132 Ind. 114 (31 N. E. 573).

The legislature has expressly conferred upon the municipality the power to erect an electric light plant, to be owned and operated by the municipality. This is for the benefit of the municipality and the inhabitants thereof. How shall it sell its said product? Can it provide for the sale of the same by contract or by ordinance? Are the rates at which it is to sell said product to be fixed by contract or by ordinance?

It is quite apparent that the legislature has the power to fix and determine the manner in which such corporation could dispose of the products of a municipally owned plant. Has it done so? It has expressly provided that the product may be sold to two classes of buyers,—those within the city limits and those without the city limits; and it has expressly provided that the rents or rates to be paid for such product shall be assessed "from time to time, in such manner as the corporation shall deem equitable, upon each tenement or other place" supplied with the product, and that a tax may be levied to maintain the plant. This provision certainly expressly directs the manner of the payment for the product of the municipal plant furnished to inhabitants of the municipality. It is clearly provided that the rates shall be fixed by ordinance (which precludes it from being done by contract), and that the rates shall be *"assessed"* by the municipality, from time to time, in such a manner as shall be deemed equitable, against each tenement or other place supplied with the product. This all has to do with the manner in which the municipality shall deal with its own inhabitants.

The rate is to be fixed by what is deemed an ''assessment'' against each ''tenement or other place'' supplied with the product. It is to be fixed ''from time to time,'' as equity may require. It is to be ''a reasonable rental or rate,'' and it is expressly provided that it shall be fixed by ''ordinance,'' which is the method by which a municipality exercises its legislative function.

We think it is also clear that the legislature expressly provided that the rate or rents to be paid for the product of said plant, in so far as it affected the inhabitants of the municipality, should be determined by the municipality, in the exercise of its legislative function: that is, not by contract, but by the enactment of an ordinance, which it was expressly provided could be changed from time to time, as might be equitable. We think it clear that the legislature expressly intended and provided that the fixing of the rates for a municipally owned plant, in so far as the inhabitants of the municipality were concerned, was the exercise of a legislative function on the part of the city, which was to be done by the enactment of an ordinance; and was subject to modification and change, from time to time, as the municipal authorities deemed equitable. The relation between the municipality and its inhabitants in regard to the establishment and maintenance of the rates for the product furnished by the municipality to its inhabitants is clearly and definitely enunciated in the statute.

Does any different rule apply with regard to the sale by the municipality of the product of its plant to individuals or private corporations who are outside of the limits of the city?

As before stated, the legislature has conferred upon the municipality the power to establish such a plant and to manufacture and sell its product. By express limitation and provision, the sale or disposition of its product to the inhabitants of the city is to be done by rates which are to be fixed by ordinance, in the exercise of the legislative power of the municipality. Is there any express grant of power to sell the product outside of the corporate limits, and if so, how is the selling price to be fixed and determined?

To the first proposition, the statute itself gives the ready and complete answer; for, by its very terms, it is provided that

the corporation may sell its product "to any municipality, individual or private corporation outside the city or town limits." How can it so sell its product outside the municipal limits, and at what price?

We find no provision whatever in regard to this in the statute. The municipality is authorized to sell the product to those outside the corporate limits.

The clause of the statute referring to the enactment of an ordinance and the assessment of reasonable rates from time to time cannot be construed to be a limitation upon the granted power to sell the product outside the corporate limits. The municipality, acting in its legislative capacity, by the enactment of ordinances for the regulation of its citizens, which may be amended and modified from time to time, cannot so operate in its dealings with those entirely outside the municipality and beyond the power of its legislative control, unless expressly authorized by the legislature so to do.

There is no expression in the statute as to how such product shall be disposed of to those outside the municipality, except that the power is conferred upon the municipality to "sell" it. How shall it be sold?

With no limitation or prohibition expressed by the legislature, it is obvious that the municipality has the power to sell it in the ordinary and usual manner in which products are sold,—that is, by contract. Having the power to sell its product to the outside world, it had the inherent and necessary power to sell it by contract at such prices and on such terms as might be agreed upon between the municipality as a party on one side, and the buyer as the party on the other. The question of good faith in executing this contract is in no way involved herein. The sole question is, Did this municipality, under the terms of this statute, have the power and right to enter into a contract with a corporation for the sale of its product outside of the corporate limits, at a price and upon terms which were agreed upon between the parties?

We are of the opinion that it had such power; that the contract was valid and binding; that it can be upheld and enforced; and that the municipality has no right or power, by the

enactment of any ordinance, to attempt to rescind, abrogate, or annul such contract.

It must be and is a general rule that, where a municipal corporation possesses authority to enter into contract for the sale of its product to those outside the corporate limits, the terms and declarations of such contract rest within the sound discretion of the municipal authorities, and when such contracts have been fairly entered into, they can only be overthrown by the courts in cases of fraud, abuse, or excess of the authority, or other like grounds justifying the rescission of contracts generally. *Marin Water & Power Co. v. Town of Sausalito,* supra.

The situation in the instant case is not to be confused with the cases where cities and towns deal with a corporation operating under a franchise granted by the municipality, and within the limits of the municipality. We have no such situation here. We are expressly limiting our decision to the question of the power of a municipal corporation to sell the product of a municipally owned plant to a party entirely outside the municipality, and to deliver such product to said buyer. We hold that, under the statute, this can be done, and that the city can make a valid contract for such sale of said product to such outside party, which contract will be upheld and enforced.

Applying these rules to the instant case, we hold that the appellant had a right to establish a municipally owned electric light plant; that it had a right to sell its product to the appellee, which was wholly outside the corporate limits of said municipality; that it had a legal right to make a contract for the sale of said product to the appellee for a certain and definite period and for a fixed, certain, and definite price; and that it had no right thereafter to seek by ordinance, and without the consent of appellee, to abrogate or rescind said contract and to substitute another price for the one fixed in the contract. Cases involving rates *within* the municipality and matters between a municipality and a franchise holder can in no manner throw light on the question presented here; and hence we do not discuss the same.

II. It is suggested that the appellee is amenable to the provision of the ordinance because the place of delivery was within the city limits. We do not so construe the contract. It must be

construed in the light of the circumstances surrounding the parties. The language used is that the delivery is to be made "at the corporate limits;" "at the present corporate limits;" "furnished at the corporate limits;" "at the point where said electric current is sold to the party of the second part;" "at the town limits of Sibley as· aforesaid;" and "the total amount of current delivered to the transmission line is to be metered at the present corporate limits."

This contract was made in contemplation of the provision of Section 724, supra, by which the municipality was selling its product to "a private corporation outside of the city or town limits." The contract was evidently made in pursuance of said statute, and a delivery of this product "at the corporate limits" did not make the purchaser amenable to the ordinances of the city. The delivery was "to the transmission line," "at the corporate limits." As we understand the record, the transmission line was wholly without the corporate limits.

Section 725 of the Code Supplement of 1913 does not apply to the facts of this case. Said section pertains solely to the regulation of rates and service within the corporation, respecting the products furnished to the inhabitants of said corporation. It has no reference whatever to the sale by the corporation of its product to one entirely outside of the corporate limits.

III. It appears from the record that the appellee, after the passage of the ordinance in question, had offered to pay to the appellant the contract rate, which the appellant refused to accept; and that appellant insisted upon the rate fixed by the ordinance. It is now claimed by appellant that, in any event, the appellant is entitled to judgment against the appellee for the contract price. It is very clear to us, from the record, that the failure by the trial court to allow this amount was the result of mere inadvertence and oversight. The case was tried and presented to the lower court upon the questions discussed herein, and it is very obvious that the finding of the lower court, in favor of the appellee, was in no way intended to defeat the right of the appellant to recover the amount that was admitted to be due under the contract. Counsel for appellee concedes that this was a mere oversight, and that appellant is entitled to judg-

2. APPEAL AND ERROR: entry of judgment: inadvertent omission in trial court.

ment for the amount due from appellee under the contract. The original decree should have so provided, and undoubtedly such finding and judgment would have been entered in the original decree, had the attention of the court and counsel been called to the matter at that time. An appeal was wholly unnecessary to determine this question. If the parties cannot agree upon a modification of the decree as entered in the lower court in respect to the payment of the amount due under the contract, an application may be made by appellant to the trial court for a modification of the decree in this respect, or said application may be presented to this court, as the appellant shall elect. The costs of the appeal will not be affected by this order respecting the modification of the decree, but will be taxed to the appellant.

The finding of the lower court upon the issue involved in this appeal is—*Affirmed.*

STEVENS, C. J., WEAVER and ARTHUR, JJ., concur.

EVANS, PRESTON, and DE GRAFF, JJ., dissent.

EVANS, J. (dissenting.)   I.   This case presents a troublesome question, and one which we have not heretofore settled. Primarily, it involves a construction of Sections 720 and 724 of the Code. It involves also a rather peculiar application of Section 725. For convenience, I shall set these sections forth as a part of the discussion. Plaintiff, the town of Sibley, had a municipally owned electric plant. In July, 1914, it purported to enter into a joint contract for the sale of its electric power, with three parties, of which the defendant was one. The other two parties were the incorporated towns of Harris and of Lake Park. These three parties are described in the contract as the "combined interests," and it will be convenient to so refer to them here. The "combined interests" were purchasing the electric power for the purpose of distribution among the inhabitants of the towns of Ocheyedan, of Harris, and of Lake Park, respectively. The defendant, however, is a private corporation, and stands as a middleman between the plaintiff and the inhabitants of Ocheyedan. The "combined interests" constructed and owned the main transmission line, and took joint delivery at the corporation line of Sibley of the sum total of the electric power provided for by the contract. This sum total

was distributed between the members of the combined interests, at a later stage of the transmission, by methods agreed upon between them. The contract rate was on a graduated scale, providing for 6 cents per K. W. if the consumption did not exceed 3,000 K. W. per month; and for 5 cents per K. W. if it exceeded 3,000 K. W. per month; and for 4 cents per K. W. if it exceeded 6,000 K. W. per month. For the purpose of this scale of prices, the "combined interests" were treated as a unit. The rates thus fixed by contract were adopted by ordinance of the town of Sibley, and the parties operated under it for about four years, except that there was a voluntary modification of it for a period of time. In the year 1919, the city council of the town of Sibley, assuming to find that the contract rates had become unreasonable, by reason of increased prices, and had become less than the cost of production, adopted by ordinance a new scale of prices, which was an increase. For the purpose of this case, no issue is made by the defendant upon the reasonableness of the rates fixed by the new ordinance. A stipulation was signed to that effect. Indeed, all the facts in the case are presented either by a stipulation or by admissions in the pleadings. This action was brought by the plaintiff to recover from the defendant the amount due, as computed under the new ordinance rate. The defendant tendered payment under the contract rate. As stated in the majority opinion, the sole question for us is: Had the city council of the town of Sibley the power to establish by ordinance the new rates? Still more directly stated, the question is: Did the city council of the town of Sibley have power, in 1914, to bind the city to a contract rate for 20 years? If it did not, then, under the stipulated facts, the present city council does have power to establish reasonable rates by ordinance, and the plaintiff is entitled to recover, as prayed. If it did have power to make the contract rate in 1914, then it does not now have the power to repudiate it by a new ordinance.

The first premise laid in the majority opinion is that the governmental and the proprietary powers of a municipality are clearly separate and distinct, and that the power exercised in the contract of 1914 was proprietary only. This premise is indispensable to the correctness of the majority opinion. On the other hand, if it were conceded, I think that the correctness

of the conclusion reached would still be subject to grave doubt. In the later discussion, it will be my contention in support of this dissent that, by express statutory provision, the power of the city council over rates is wholly legislative, and not proprietary. For the moment, however, I assume the correctness of the premise, for the purpose of showing that it will not solve the difficulty confronting us. Suppose, for the moment, that the town of Sibley stood in the attitude of a proprietor, like any private corporation. It has entered into contract, not with the defendant alone, but with the defendant jointly with the incorporated towns of Harris and of Lake Park. True, these towns are not parties to this case. But if the majority opinion is sound, then the contract is valid, not only as to the defendant, but as to the joint parties thereto. We have before us, then, a case of contract between the proprietor of an electric light plant and an incorporated town, which fixes the rates by contract for a period of 20 years. Without any doubt, this is in direct violation of Section 725, as we have heretofore held. *Town of Woodward v. Iowa R. & Lt. Co.*, 189 Iowa 518. Section 725 expressly withholds from city councils the power to make rates by contract for any specified time. We have construed this to mean that the power to make rates is always in the present city council, and that no city council can tie the hands of any future city council on that question. This means that, notwithstanding the contract rate entered into in 1914 for the furnishing of electric power to the towns of Harris and of Lake Park, the question of rates was at all times subject to revision by the city councils of those towns respectively. Clearly, therefore, those towns have never been bound to maintain such contract rate, except so far as it shall be found reasonable by the respective city councils. This contract rate provision being nugatory, therefore, as to the towns of Harris and of Lake Park, was it still binding upon the proprietor of the power plant? That is a question that has come near confronting us in a number of cases, and which we have not yet met. The question of the right of the serving city in such a case is touched upon in the case of *City of South Pasadena v. Pasadena L. & W. Co.*, 152 Cal. 579 (93 Pac. 490), cited in the brief of appellee. We quote therefrom the following:

"The powers of the two cities in regard to this water service will be separate and distinct. One will be subordinate to the other, and hence there will not be two cities exercising the same powers in the same territory at the same time. South Pasadena, within its own limits, will be the sole representative of sovereignty in the fixing of rates and in the supervision of the streets; and Pasadena will be subject thereto, as a private person. If, by fixing too low rates, South Pasadena should attempt to compel the service to be made at a loss, Pasadena would have the same remedies, and no greater, in the courts that a quasi public corporation or natural person would have in the same circumstances. The fact that the outside service is within another city does not appear to be a significant factor in the question of the power. If it were in a rural community, the rates charged would be subject to judicial control, to make them reasonable. Being in another city, the serving city has a right to demand reasonable rates, and may enforce them if not granted. The limitations would not affect the power in one case more than in the other."

Applying the foregoing discussion to the case before us, it would mean that the towns of Harris and of Lake Park could at any time repudiate the rates as unreasonable, and fix upon alleged reasonable rates; and on the other hand, the town of Sibley could at any time repudiate the rates, whether fixed by the contract or by ordinance of the towns of Harris and of Lake Park, and could refuse to render service for less than reasonable rates.

I recognize that my argument up to this point is somewhat beside the mark, because the particular defendant herein is a private corporation, and is not subject to the disability created by Section 725, as against a municipality. The defendant could bind itself by a contract. Whether the fact is influential that this private corporation was organized as an intermediary, and for the sole purpose of furnishing electric power to the town of Ocheyedan, and presumably had a franchise for that purpose, and that the rates contracted for could not be made binding upon the town of Ocheyedan, either by contract or otherwise, except perhaps by ordinance of the city council, might present an interesting question. I shall not enter upon it. My discus-

sion of the disability of the towns of Harris and of Lake Park is intended only as preliminary to the main question.

II.   I turn, therefore, to the main question: Did the city council of the town of Sibley in 1914 have power to bind the city and its inhabitants to a fixed contract rate for 20 years? The power to fix rates for public utilities has always been deemed legislative. It was so at common law. By Section 473 of the Code of 1873, the legislature expressly conferred power upon the city councils to enter into contracts for rates for a limited period of time. This power was by later legislation withdrawn, and has never since been conferred. It is conceded in this case that the town of Sibley did have the legislative power to fix the rates for its own inhabitants, but it is contended that it had no legislative power beyond its corporate limits. One of the premises laid down by the majority opinion is that a city council has no extraterritorial legislative power, unless it be conferred by the legislature. I grant it. It is equally true that it does have extraterritorial legislative power when such power is conferred by the legislature. This rule is stated by McQuillin as follows:

"The right to exercise police power beyond the municipal area must be derived by legislative grants which expressly or impliedly permit it. It is not unusual to grant cities and towns the right to exercise police regulations beyond their corporate limits." 3 McQuillin on Municipal Corporations, Section 897.

The question at this point, therefore, resolves itself into a question of construction of Sections 720 and 724. Do they confer extraterritorial legislative power upon the city council of the town of Sibley? The majority opinion answers this question in the negative. It can just as readily be answered in the affirmative. Section 720 provides as follows:

"They shall have power to purchase, establish, erect, maintain and operate, within or *without* the corporate limits of any city or town, heating plants, waterworks, gasworks or electric light or electric power plants, with all the necessary reservoirs, mains, filters, streams, trenches, pipes, drains, poles, wires, burners, machinery, apparatus and other requisites of said works or plants and lease or sell the same. * * * And they shall have power to enter into contracts with persons, corporations or mu-

nicipalities for the purchase of heat, gas, water, and electric current for either light or power purposes, and shall have power to sell the same either to *residents of such municipality, or to others,* including corporations, and to erect and maintain the necessary transmission lines therefor *either within or without* the corporate limits, to the same extent, in the same manner, and under the same regulations, *with the same power* to establish rates and collect rents as is or hereafter may be provided by law for cities having municipally owned plants.''

The last clause of the foregoing section carries us to Section 724, as being the only statute which has to do with the regulation of rates for municipally owned plants.

Section 724 provides as follows:

''They shall have power, when operating such works or plants, and shall have the power to sell the products of such * * * plants, to any municipality, individual or private corporations *outside of the city or town limits as well as to individuals or corporations within* its limits, and to erect in the public highway the necessary poles upon which to construct transmission lines, and to assess from time to time, in such manner as they shall deem equitable, *upon each tenement or other place supplied* with water, gas, heat, light or power, reasonable rents or rates fixed by ordinance, and to levy a tax, as hereafter provided, to pay or aid in paying the expenses of running, operating, renewing, extending and repairing such works or plants owned and operated by such city or town, and the interest on any bonds issued to pay all or any part of the cost of their construction.''

It is argued in the majority opinion that these sections designate two classes, viz.: (1) Those living within the city; (2) those living without the city. Would it not be more accurate to say that, instead of dividing them into two classes, it *unites* all, whether *within or without,* into *one* class? The provisions of the statute relate to *all* the proposed patrons, ''either within or without the corporate limits.'' No person, either within or without the corporation, becomes the patron of the plant, and subject to rates, except upon his own volition. When he does become a patron, whether within or without the city limits, the statute extends the jurisdiction of the city council over him to make rates, and requires that the rates fixed be

reasonable. In that respect, the statute operates uniformly upon all patrons.

Stress is laid by the majority upon the provision that permits the municipality "to sell." It is argued that this implies a power to contract for the rate. But this power to sell expressly applies to persons within the city, as well as to those without. In Section 720, the language is:

"Shall have power to sell the same either to residents of such municipality or to others."

In Section 724, the language is:

"Shall have the power to sell the products of such * * * plants, to any municipality, individual or private corporations outside of the city * * * as well as to individuals or corporations within its limits."

If we are to hold, therefore, that the conferring of power "to sell" implies power to contract for a rate, then it follows that the town of Sibley could bind itself to its own citizens by a contract rate for 20 years. It will hardly be contended that such was the intent of the statute. Such construction would render wholly nugatory the later express provisions requiring the city to fix reasonable rates "from time to time." I think, therefore, that the natural construction of these sections of the statute is that they conferred extraterritorial jurisdiction upon the city council to fix rates over those who chose to become its patrons; that the power conferred as to rates was wholly legislative, and was in no sense arbitrary or proprietary; and that, being legislative, it was to operate uniformly and reasonably as to all patrons.

I recognize that, when such extraterritorial power is extended so as to include other municipalities, it brings into conjunction two jurisdictions, each of which has its powers under the statute. In my judgment, the solution of such a conjunction is indicated in the *Pasadena* case, from which I have above quoted.

III. As incidental to the main discussion, I think there is undue emphasis put in the majority opinion upon the premise that the governmental and proprietary characters of the municipality "are clearly separate and distinct," and that too much is predicated thereon. While it is true that this dual character of a municipality is recognized, it is not correct to say that the

powers conferred upon the municipality in the separate characters are clearly distinct and separate. It would be more accurate to say that they are usually so blended that they cannot be distinguished at all. The duality itself is a fiction of speech and argument which has been generally accepted for a very limited purpose. One purpose subserved by it—and I am not sure but that it is the only purpose—is to create liability of the city for negligence resulting in personal injuries in the management of municipal plants.

In *Davoust v. City of Alameda*, 149 Cal. 69 (84 Pac. 760), this question is discussed by Justice Shaw, as follows:

"The authorities uniformly hold that the duties arising from the operation of gasworks, electric works, waterworks, and such like public utilities, are of the private nature which is required to make municipal corporations liable for damages caused by negligence therein. It is evident, however, that the division of municipal functions into two classes, one public and governmental, the other private and corporate, is without any real foundation, and is made solely from the supposed necessity of doing so in order to allow a suit to be maintained for such injuries. In its public functions a municipality was said to represent the sovereign power, and as such, to be exempt from private action. Hence, with respect to the class of powers here involved, it was considered necessary to designate them as private in character, in order to uphold a suit to recover for these injuries. The only reason given for classifying the power to administer public utilities as private and corporate, is that private persons and corporations frequently engage in such enterprises; that they are carried on by the city for its own profit; and, in a few cases, that the municipality has contracted with the sovereign power to do such things, and is, therefore, acting in a private capacity. None of these reasons is of any force. * * * It may be that, in former times, cities engaged in such enterprises for the sake of the profit to be made thereby. But, under our system, its charges for service are fixed solely for the purpose of covering the operating expenses and providing a sinking fund, and profit, if any, is merely incidental. The making of contracts with the state by municipalities to supply such public needs is with us utterly unknown. In our form of

government and under our constitutional provisions, a city can have no active powers or functions that are not public and governmental in character. * * * It must be conceded that the rule holding cities liable for such injuries is more conducive to justice than would be the contrary. 'The rule of law is a general one, that the superior or employer must answer civilly for the negligence or want of skill of his agent or servant in the course or line of his employment, by which another, who is free from contributory fault, is injured. Municipal corporations, under the conditions herein stated, fall within the operation of this rule of law.' (2 Dillon on Municipal Corporations, Section 968.)''

In a later case, *Marin Water & Power Co. v. Town of Sausalito,* (Cal. App.) 193 Pac. 294, the foregoing opinion by Justice Shaw was approved by the court, as follows:

''We are constrained, therefore, to accept the distinction which the Supreme Court has thus made between the governmental and proprietary functions of municipalities, although in doing so we are disposed to give our approval to that portion of the concurring opinion of Mr. Justice Shaw in the case of *Davoust v. City of Alameda,* supra, in which such a distinction is declared to be wholly fictitious, and apt to produce embarrassing consequences, if extended and applied to other cases than those then before that court.''

When it is considered further that a municipality is a mere creation of the statute; that it has no capital which it may invest in proprietary enterprises; that all of its obligations must ultimately be met by taxation; that it can have no arbitrary control over any fund or funds which it may accumulate; that it acts at all times under statutory direction with reference to any municipal property, and is subject at all times to statutory limitations; that whatever property it may acquire pursuant to the statute remains at all times subject to legislative control; and that every statute under which it acts is always subject to legislative amendment,—it will readily be seen that the relation of a municipality to municipal property is not that of a proprietor, in any emphatic sense, but is that of a public or governmental trustee, and that its administration and use of the property must all be had pursuant to the governmental powers

conferred by legislation upon it. It can exercise no other power over its own property than that which is conferred upon it by the legislature. The statute has not conferred upon it any power of attempted speculative enterprises or profits on behalf of its inhabitants. It is permitted to acquire public utilities and to manage the same, but the method of management is closely defined. This is permitted in the interest of the public good, and doubtless in the interest of economy. But it is required to make the public investment and the return thereon balance, even though resort be had to taxation for that purpose. Rates are to be reasonable,—nothing more, nothing less. Neither profit nor loss is contemplated or is even permissible, in a speculative sense. This, in my judgment, is the fair purport of the brief statutes which govern the municipality in the administration of the trust. A long-term contract for a rate is speculative in character. It might result in great profit to the municipality, and on the other hand, might result in great loss. It would become highly profitable only in the event that the rates became unreasonably high. To collect such rates would be, to violate the statute. If the contract should become a losing one, it would be because the rates were unreasonably low. The municipality has no capital against which such losses could be charged. It could only retrieve such losses by resort to taxation. Its power of taxation is always subject to statutory limitations. The cardinal principle laid down for the control of public utilities by municipalities in the matter of rates is that they shall at all times be *reasonable,* and that, with such guide before it, the city council shall, from time to time, by appropriate ordinance revise such rates.

Assuming it to be true, as all will doubtless concede, that a municipality as *grantee* cannot contract for an unalterable rate to be paid *by* its inhabitants, I think it is equally true that it is under the same disability to contract as a *grantor* for an unalterable rate *from* its patrons.

I think, therefore, that the contract before us must be construed as though the statute were made a part thereof, and that the rate contracted for is to be deemed a reasonable rate for the time being only. It is not to be deemed an unalterable one.

In the foregoing discussion, I have assumed, as does the

majority opinion, that the delivery of the electric power by the plaintiff to the defendant was outside the corporate limits of the town, and not inside thereof. The question whether it was thus delivered would be immaterial, if I am correct in the foregoing discussion. On the other hand, it becomes very material if the view of the majority opinion prevails. Though the printed record is somewhat obscure, a careful examination of it discloses that the delivery of the electric power to the defendant was literally *within* the corporate limits, although "at the corporate limits." The record discloses that the plaintiff leased to the defendant a tract of ground at the corporation limits, whereon the defendant was to and did construct its substation. It was at this substation that the power was metered through the meter of the plaintiff. The opinion and decree of the trial court recognize the fact that the delivery was literally within the corporate limits; but because the delivery was for the purpose of outside consumption, the trial court held that this made it the legal equivalent of an outside delivery. The fact remains that the jurisdiction of the plaintiff city and its council over the substation and over its own meter therein would not be an extraterritorial jurisdiction. If the city was under disability in 1914 to make an unalterable contract rate within its corporate limits, then it had jurisdiction all the time to prescribe reasonable rates within the corporate limits. It had jurisdiction for this purpose over every other meter within such limits. How can it be said that it did not have jurisdiction over this meter in the defendant's substation, the lateral dimension of which extends 50 feet from the corporate line? The importance, therefore, of this question is that, if the majority opinion in its final result be sustained, then decision must be put upon some other ground than that the city was without extraterritorial jurisdiction to fix reasonable rates.

PRESTON and DE GRAFF, JJ., join in this dissent.