[Civ. No. 12350. First Dist., Div. One. June 2, 1943.]

YOSEMITE PORTLAND CEMENT CORPORATION (a Corporation), Respondent, v. STATE BOARD OF EQUALIZATION OF THE STATE OF CALIFORNIA et al., Appellants.

Earl Warren, Attorney General, Robert W. Kenny, Attorney General, H. H. Linney, Assistant Attorney General, and Adrian A. Kragen, Deputy Attorney General, for Appellants.

John J. O'Toole, City Attorney (San Francisco), Dion R. Holm, Assistant City Attorney, Nora A. Blichfeldt, Deputy City Attorney, and Earl & Hall & Gerdes for Respondent.

PETERS, P. J.—The Yosemite Portland Cement Corporation brought this proceeding for the purpose of compelling the State Board of Equalization to approve its claim for a refund of retail sales taxes paid by it under protest.

After overruling the demurrer of respondents, the trial court, by peremptory writ of mandate, ordered the board to refund or to credit the petitioner with the sum of $2,017.07 found to have been illegally collected from it. The board, its members, and other state officers and agencies named in the petition, appeal.

The taxes involved were assessed against the Yosemite company based upon its gross receipts from sales of cement to a department of the city and county of San Francisco known as the Hetch Hetchy Project. This cement was sold to the Hetch Hetchy Project under the following circumstances: On May 3, 1932, the electorate of San Francisco approved a bond issue in the sum of $6,500,000 to complete the Hetch Hetchy water project. One part of the work contemplated was the construction of the Coast Range tunnel. The city submitted that construction work to competitive bidding. Several private contractors and the Hetch Hetchy Project submitted bids. Under §95 of the charter of the city and county of San Francisco departments of the city are allowed to bid on such projects. Bids were opened in June of 1932 and the Hetch Hetchy Project was the lowest bidder. In August of 1932 the contract for the construction of the

tunnel was awarded the Hetch Hetchy Project. Sometime after August 1, 1933, certain quantities of cement were sold by the Yosemite company to the Hetch Hetchy Project for use in the performance of the contract awarded the project. The gross receipts from these sales were taxed by the board, were paid by the company under protest, and after a claim for refund had been denied, this petition was filed.

The controversy as to whether these sales were subject to the act turns upon the correct interpretation of §5 of the Retail Sales Tax Act of 1933 which became effective on August 1st of that year (Stats. of 1933, chap. 1020, p. 2599; Deering's Gen. Laws, 1937, Act 8493). So far as pertinent here, §5 reads as follows:

"There are hereby specifically exempted from the provisions of this act . . . the following: . . .

"(d) The gross receipts from sales of tangible personal property used for the performance of a contract on public works executed prior to the effective date of this act."

Both litigants concede that the fact that the sales of cement by the Yosemite company to the Hetch Hetchy Project occurred subsequent to the effective date of the statute is immaterial if there was a "contract on public works executed prior" to that date. The board contends that the transaction by which the city awarded the construction of the tunnel to the Hetch Hetchy Project and by which the project agreed to perform that work, was not a "contract" within the meaning of §5(d), *supra*. The board contends that the Hetch Hetchy Project is simply a department of the city government; that where a department enters into an arrangement to do city work for the city it is simply a case of the city contracting with itself; that to constitute a "contract" there must be two parties of separate identity, and there must be a remedy to enforce the obligations; that in the instant case the arrangement was not a "contract" within the general definitions found in the Civil Code (§§1549, 1550). This argument presupposes that the Legislature, in using the phrase "contract on public works" used the term "contract" to mean a transaction of the type complying with the general code sections on that subject. There can be no doubt that the Hetch Hetchy Project is not a separate corporate entity. There can also be no doubt that under general contract law it is of the essence of a contract that there be two contracting

parties of separate identity. For that reason the transaction between the project and the city was not a contract within the general meaning of that term. But that conclusion is not determinative of the issue here presented. The very question here involved is the sense in which that term was used in §5(d). The Legislature may properly describe as a "contract" within the meaning of a particular statute a transaction which lacks one or more of the characteristics of a contract as generally defined. It is our opinion that the Legislature must have intended that the word "contract" as used in §5(d) should include agreements of the type here involved between a department and the city.

■ The city and county of San Francisco adopted a new charter which was approved by the Legislature in 1931. (Stats. of 1931, p. 2973, p. 2978.) Section 122 (Stats. of 1931, at p. 3048) of that charter as thus approved provides that the municipal railway, the water department and "the Hetch Hetchy project until the completion thereof when it shall be merged with the water department . . . shall each be designated as a department under the [Public Utilities] commission. . . ." Section 95 of the charter (Stats. of 1931, at p. 3035) is the section that deals specifically with the award of contracts on public works. The section is headed "Contracts. Public Works and Purchasing Contracts." It requires that the construction of public works costing over $1,000 "shall be done by contract," and shall be let to the lowest responsible bidder. It then expressly provides that: "The board of supervisors, by ordinance, shall establish procedure whereby appropriate city and county departments may file sealed bids for the execution of any work to be performed under contract. If such bid is the lowest, the contract shall be awarded to the department. Accurate unit costs shall be kept of all direct and indirect charges incurred by the department under any such contract, which unit costs shall be reported to and audited by the controller monthly and on the completion of the work." This charter provision, being part of a charter approved by the Legislature, must be "construed as a law enacted by the Legislature." (*Bruce* v. *Civil Service Board*, 6 Cal.App.2d 633, 636 [45 P.2d 419].) Such approved charter is a law of the state, and has the same force and effect as a law directly enacted by the Legislature. (*C. J. Kubach Co.* v. *McGuire*, 199 Cal. 215 [248 P. 676];

*Stern* v. *City Council of Berkeley*, 25 Cal.App. 685 [145 P. 167]; *Taylor* v. *Cole*, 201 Cal. 327 [257 P. 40]; *Whitmore* v. *Brown*, 207 Cal. 473 [279 P. 447].) We must presume that the 1933 Legislature in adopting §5(d) knew what the 1931 Legislature had done in approving §95 ·of the San Francisco Charter.

Acting pursuant to the power conferred by §95, *supra,* the city adopted a Contract Procedure Ordinance making detailed provision for the manner of awarding public contracts. Section 7 of that ordinance provides that "departments may file sealed bids for the execution of any work to be performed under a contract"; that bids of a department must be approved by the controller; that "if the bid of a city and county department, as investigated and approved by the controller, is the lowest, the contract shall be awarded to the department and accurate unit costs shall be kept of all direct and indirect charges incurred by the department under any such contract . . ." Section 9 of the same act requires the controller to keep records of the total direct and indirect costs of work done by departments, and confers upon him the power to "refuse to approve contracts with a department shown to be repeatedly underbidding on contract work and failing to complete same within the contract price."

It was under these charter and ordinance provisions that the "contract" to construct the tunnel was awarded to the Hetch Hetchy Project. Four private contractors, as well as the project, submitted bids. That of the project was substantially lower than those submitted by the private contractors. It is obvious, and the board admits, that if one of the private contractors had been awarded the contract the sales of cement by the Yosemite company to such a contractor would have been exempt from the tax.

 It will be noted that the charter and the ordinance repeatedly refer to the awarding of a bid to a department as a "contract." Thus the Legislature of 1931 in approving the charter used the term "contract" to include arrangments between a department and a city. When the Legislature of 1933 adopted the Sales Tax Act, and particularly §5(d) exempting gross receipts on sales of property "used for the performance of a contract on public works" it is a reasonable inference that they meant to include the type of arrangement designated as a "contract" by the prior Legislature.

Both the charter provisions and §5(d) of the taxing statute relate specifically to public works. For that reason the term "contract" should be interpreted, if possible, to mean the same thing in both statutes.

This construction is fortified by the fact that one of the obvious purposes of §5(d) was to protect contractors who had entered into contracts for the construction of public works prior to the effective date of §5(d) from having their costs increased by the amount of the new tax when their bids were figured without reference to such taxes. This was the view taken of the purpose of the statute by the attorney general in June of 1939 when he was called upon to rule upon the taxability of certain sales to contractors working on the Golden Gate Bridge. In that opinion (N.S. 1788) it is stated: "The foregoing exemption was adopted by the Legislature with full knowledge of the fact that construction work had started on the bridge project and that bids had been made and accepted for the construction work. It was realized that the economic effect of the act on contractors would be serious and possibly disastrous and therefore the Legislature was moved to adopt the exemption in order to avoid harsh and unjust results. No discrimination, it may be assumed, was intended as between contractors on this project. The intent apparently was to protect all who were no longer free to protect themselves; that is to say, those who had already executed their formal contracts as well as those who had, by the acceptance of their bids, become bound to performance." The same economic argument applies with even greater force where a city and county itself is doing the work through a department. The bid of such department, accepted prior to the passage of a sales tax, just as would be the case of a contractor's bid, would be made without reference to prospective sales taxes. To exclude departmental bids from the operation of §5(d) would be to place an additional burden on the public revenues of the city by the imposition of sales taxes not in contemplation when the bid was submitted and approved. Certainly it was never the purpose of the statute to protect retailers in their dealings with private contractors but to leave them defenseless when dealing with a governmental agency. Particularly is this argument applicable to public works being performed by a department pursuant to a bond issue. In determining whether the work shall be done

the city must keep the costs within the limits of the bond issue. If the costs to the city were to be increased by reason of the subsequent imposition of the sales tax on retailers it might result in such costs exceeding the amount authorized by the bond issue. All these factors must have been in the mind of the Legislature when § 5(d) was adopted. It is true that in a prior opinion of the attorney general, dated February 1, 1935, addressed to the State Board of Equalization, the attorney general ruled that the very transactions here involved were subject to the tax, giving as his reason the belief that the awarding of a bid to a department did not create a contract within the meaning of §5(d). But this opinion did not discuss the arguments contained in the subsequent opinion.

The board points to a statement appearing in *Roth Drug, Inc.*, v. *Johnson,* 13 Cal.App.2d 720, 739 [57 P.2d 1022], that the exemption contained in §5(d) "was provided to prevent the act from having the effect of violating the obligations of contracts." This reason would not be applicable to a "contract" between a department and the city, because such a transaction is not within the impairment of obligations of contract clause. The statement in the Roth case did not purport to declare that the reason given was the sole reason for passing the provision. The economic reason above given might very well have been a factor as well as the legal factor mentioned in the Roth case.

The board contends that any ambiguity in §5(d) must be construed against the Yosemite company under the rule that tax exemptions must be strictly construed against the taxpayer. (*Bay Cities Transp. Co.* v. *Johnson,* 8 Cal.2d 706 [68 P.2d 710]; *Miller v. McColgan,* 17 Cal.2d 432 [110 P.2d 419, 134 A.L.R. 1424].) The Yosemite company contends that that rule has no application to tax exemptions applicable to municipalities. (*Pasadena* v. *County of Los Angeles,* 182 Cal. 171 [187 P. 418].) The present exemption is not directly applicable to municipalities. The sales tax is imposed on retailers and the exemption is in favor of retailers selling to a governmental agency. Obviously, however, if the Yosemite company has to pay this tax it will be passed on in similar transactions to the governmental agency. Under such circumstances we think the exemption, which is expressly limited to contracts "on public works," should be given

a normal reasonable construction rather than a strict construction against the taxpayer. So construed we think, for the reasons given, the words "contract on public works" in §5(d) must be construed to mean the same thing as is meant by similar terms in the charter of San Francisco. For that reason the transactions here involved are exempt.

The judgment appealed from is affirmed.

Knight, J., and Ward, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 29, 1943. Traynor, J., did not participate therein.