**TRANS WORLD AIRLINES, Inc.**

v.

**CITY AND COUNTY OF SAN FRANCISCO et al.**

**Civ. A. No. 30326.**

United States District Court
N. D. California, S. D.
March 5, 1954.

---

3. Tit. 22, Sec. 50.18 et seq., Code of Federal Regulations (1949 Ed.).

still refuses to pay these higher rates, insisting that the limits of its liability are the charges fixed by the lease. Defendant has advised plaintiff that it must pay under the schedule of rates and charges, and that in default of such payments the airline will be deprived of certain facilities at the airport. This action for declaratory relief followed.

The City contends that the rates in the schedules are enforceable only as they apply to landings, take-offs, and other common use facilities; as to those properties not used in common it is admitted that the lease controls. The questions advanced may be summarized as follows:

(1) Does the furnishing of common use facilities at the airport to the airlines constitute a public utility service?

(2) Does the Public Utilities Commission of the City have rate-making jurisdiction over the airport?

(3) Does the law allow a public utility to depart from the regular schedule of rates and charges by contract?

(4) Does the doctrine of commercial frustration apply to the facts of this case?

Lloyd Wright and Charles A. Loring, Los Angeles, Cal., E. M. Prince and Noel Dyer, San Francisco, Cal., for plaintiff.

Dion R. Holm, City Atty., A. Dal Thomson and Thomas O'Connor, Deputy City Attys., San Francisco, Cal., for City and County of San Francisco.

ROCHE, Chief Judge.

Plaintiff is a corporation which in the course of its business utilizes land and facilities so that its airplanes may land, take off, and be serviced and stored.

Defendant, represented by its Public Utilities Commission, business operator of the San Francisco Airport, in 1942 entered into a 20-year lease agreement with the plaintiff to furnish the land and facilities so used.

Twice during the life of this lease between the parties litigant, the Public Utilities Commission of the City regulated and prescribed rates which plaintiff and the other airlines were to pay for using the airport.

The rates prescribed by the Public Utilities Commission were higher than the rates fixed by the lease of plaintiff and defendant. Plaintiff refused, and

1. Public Utility Function.

In the total design of the airport "common use facilities" are installed which are available in the operation of all aircraft. These are the runways, where planes land and take off; the landing aprons or ramps where passengers and cargo are taken on and discharged; the taxi-ways which connect the runways with the loading aprons or ramps; and other conveniences and facilities such as lights, signals, beacons, control tower, etc., shared by all airline companies utilizing the airport. The defendant maintains that the utilization of the enumerated areas and facilities involves the provision of a public utility service to the airlines as customers of this service.

Plaintiff counters with the proposition that the public to be served by the airport is the general public which uses it; that these people, and not the airlines, are the true customers of the airport's facilities. To support its argument

plaintiff points out that 3,250,000 members of the general public used the airport last year, but that only 12 airlines are parties to the contracts entered into for facilities. However, the fact that only relatively few airlines use the service does not control the question. The number using the service may be few in number. Camp Rincon Resort Co. v. Eshleman, 1916, 172 Cal. 561, 158 P. 186. Indeed, the fact that only one customer uses the services rendered does not control the question. Ford Hydro-Electric Co. v. Town of Aurora, 1932, 206 Wis. 489, 240 N.W. 418.

■ What does control then? The factor which as far as the public is concerned determines whether an agency is a public utility, is whether all persons, many or few, corporate or individual, who from the nature of the service rendered are in a position to require it, have a right to be supplied the service on equal terms. Allen v. R. R. Commission, 1918, 179 Cal. 68, 175 P. 466, 8 A.L.R. 249. The limitations of place, requirements, ability to pay and other facts determine the customers that will use a particular service. Terminal Taxicab Co. v. Kutz, 1916, 241 U.S. 252, 36 S.Ct. 583, 60 L.Ed. 984.

Plaintiff cites the cases of Marin Water & Power Co. v. Town of Sausalito, 1914, 168 Cal. 587, 143 P. 767, and Del Mar Water, Light & Power Co. v. Eshleman, 1914, 167 Cal. 666, 140 P. 591, 948, as instances where the court found that the contracting parties were not in a relationship of public utility and customer. In the Marin Water case a water company contracted to supply a muncipality with a bulk supply of water for 10 years. The municipality in turn sold the water to its inhabitants. The question raised was whether the water company was functioning as a public utility in supplying the City with water under this contract. This case is inapplicable as it involves a sale in bulk of a commodity from one utility to another. In the instant case there is a continuing service rendered by one utility to another, this latter utility being a member of the general public served.

The Del Mar case is also distinguishable. The court found in this case that the utility had not offered its water to the general public. The sale of water to the 17 inhabitants of the town of Del Mar was on a per barrel basis. It was like the private sale of water by a farmer having a well in his back yard. This case is limited to cases presenting similar facts.

■ The public function of a municipal airport is recognized in many cases. State ex rel. City of Lincoln v. Johnson, 1928, 117 Neb. 301, 220 N.W. 273; State ex rel. City of Bucyrus v. Jackson, 1929, 121 Ohio St. 186, 167 N.E. 396; Price v. Storms, 1942, 191 Okl. 410, 130 P.2d 523; Jones v. Kock, 1946, 79 Ohio App. 549, 74 N.E.2d 644; City of Toledo v. Jenkins, 1944, 143 Ohio St. 141, 54 N.E. 2d 656; State ex rel. Helsel v. Board of County Commissioners, 1947, 149 Ohio St. 583, 79 N.E.2d 698, 911. In the case of City of Toledo v. Jenkins, cited supra [143 Ohio St. 141, 54 N.E.2d 663], the court stated. "The statutory provisions confer upon the municipal corporation power to own or lease and operate landing fields and improve them with runways, buildings or other structures, so as to make them fully equipped aircraft and transportation terminals. As an airport of that character is a public utility (State ex rel. Chandler v. Jackson, 121 Ohio St. 186, 167 N.E. 396), the Toledo Municipal Airport was and is a complete public utility".

■ The San Francisco Airport has been built with public funds for the public use. It is the determination of this court that this use is twofold. On one hand for the use of the air-traveling public, and on the other, for the use of those individuals and corporations using the airport for their aircraft. Certainly this latter group is more restricted than the former, but this fact does not mitigate against the public utility function of the City as regards the common use facilities. These facilities are offered to

the airline companies as customers of the airport; they are offered as a public utility service.

2. Rate-Fixing Power of the San Francisco Public Utilities Commission Over the San Francisco Airport.

Section 121 of the charter of the City and County of San Francisco gives the Public Utilities Commission jurisdiction over the airport, and provides in part:

"The public utilities commission shall have charge of the construction, management, supervision, maintenance, extension, operation and control of all public utilities and other properties used, owned, acquired, leased or constructed by the city and county, including airports, for the purposes of supplying any public utility service to the city and county and its inhabitants, to territory outside the limits of the city and county, and to the inhabitants thereof."

The rate-fixing power of the Public Utilities Commission is found in Section 130 of the charter, which provides in part:

"The commission shall have the power to fix, change and adjust rates, charges or fares for the furnishing of service by any utility under its jurisdiction, and to collect by appropriate means all amounts due for said service, and to discontinue service to delinquent consumers and to settle and adjust claims arising out of the operation of any said utilities.

Rates may be fixed at varying scales for different classes of service or consumers. The commission may provide for the rendition of utility service outside the limits of the city and county and the rates to be charged therefor which may include proportionate compensation for interest during the construction of the utility rendering such service."

■■ No confusion should arise by reason of the coincidence that the rate-fixing body in this case happens to be the Public Utilities Commission, also having jurisdiction over the utility itself. In entering the lease the Public Utilities Commission was acting proprietarily. In the exercise of its rate-fixing power the Commission is acting as a public rate-fixing body even though it is engaged in a function as operator of the utility. Connett v. City of Jerseyville, 7 Cir., 110 F.2d 1015. In California a municipality has the power to fix rates and charges of municipally owned utilities. Durant v. City of Beverly Hills, 1940, 39 Cal.App. 2d 133, 102 P.2d 759; Jochimsen v. City of Los Angeles, 1921, 54 Cal.App. 715, 202 P. 902; Bowles v. City and County of San Francisco, D.C.1946, 64 F.Supp. 609; City of Pasadena v. Railroad Commission, 1920, 183 Cal. 526, 192 P. 25, 10 A.L.R. 1425.

■ The approved charter of a municipality is a law of the state and has the same force and effect as a law enacted by the legislature. Yosemite, etc. v. State Board of Equalization, 1943, 59 Cal. App.2d 39, 138 P.2d 39. Under Section 130 of the charter the Public Utilities Commission is empowered to establish rates and charges for the furnishing of utility services outside the limits of the city and the rates to be charged therefor. In order for the services of an airport to be rendered outside the limits of a municipality it necessarily follows that the airport be constructed outside the boundaries of the municipality.

■ Plaintiff contends that the police power of the city, including its rate-fixing power ceases at its borders, and that only a proprietary power may be exercised beyond its borders. South Pasadena v. Los Angeles Terminal Ry. Co., 1895, 109 Cal. 315, 41 P. 1093; Incorporated Town of Sibley v. Ocheyedan Electric Co., 1922, 194 Iowa 950, 187 N.W. 560; City of Colorado Springs v. Colorado City, 1908, 42 Colo. 75, 94 P. 316. This is true except in those cases where the legislature has provided for the exercise of this power. The charter of the city, approved by the legislature, specifically provides for the exercise of this power, and therefor the Public Utilities Commission has jurisdiction to set the rates and charges for the common use facilities at the airport.

3. Departure from the Prescribed Rates by Contract.

It is this court's decision that in affording the common use facilities at the airport to the airlines that the City is engaged in a public utility function. Plaintiff contends that, notwithstanding this fact, the City can by lease agreement fix with each individual airline using the airport the charges for these facilities and services for a definite term.

Plaintiff cites two Supreme Court cases. Home Telephone & Telegraph Co. v. City of Los Angeles, 1908, 211 U.S. 265, 29 S.Ct. 50, 53 L.Ed. 176, and St. Cloud Public Service Co. v. City of St. Cloud, 1924, 265 U.S. 352, 44 S.Ct. 492, 68 L. Ed. 1050, as instances where a public utility was held to have entered into a binding contract for the furnishing of a utility service at a fixed charge. Both cases are distinguishable from the instant case.

The charges fixed by contract in both of these cases were applicable not to any one consumer alone, but to all members of the public served. In other words, any member of the public utilizing the public utility service offered had a right to be served at the same price paid by those similiarly situated. In the instant case the lease agreement constitutes nothing more than a contract between *one* consumer, and a public utility, not for the purpose of establishing a uniform rate to be charged all members of the public using the utility, but rather to establish a preferential position for this one consumer for twenty years. A contract of this type is entirely valid when executed, and is binding in the absence of rate regulation by the Public Utilities Commission acting on behalf of the public. Any intention on the part of the parties to fix charges not subject to regulation is inoperative as a matter of law. The decisions next mentioned fully support the conclusion that, with reference to the common use facilities, the general schedule applicable to all must as a matter of law, be applied to this contract.

The case of Pinney & Boyle Co. v. Los Angeles Gas Co., 1914, 168 Cal. 12, 141 P. 620, L.R.A.1915C, 282, decided by the Supreme Court of this state is in point. This was a suit to enforce the terms of a contract entered into between plaintiff and defendant whereby the plaintiff agreed to take for operation of its machinery, and defendant to supply electricity for that purpose. Defendant was engaged as a public utility in the supply of electricity to the inhabitants of the City of Los Angeles. While this private contract between the parties was in existence, the City of Los Angeles, through its legislative body, regulated and prescribed the rates which the defendant public service corporation was permitted to charge consumers. Apparently, at the time of the contract, the rate-fixing power had not been exercised by the municipality.

The court held that the fixation of the rate thus adopted controlled over the terms of the contract. The court ruled that a contract of such nature must necessarily yield to a subsequent exercise of the rate-fixing power. This was on the ground that the parties are deemed to have contracted with that result in view. A holding, identical to that made in the case which has preceded appears in Law v. Railroad Commission, 1921, 184 Cal. 737, 195 P. 423, 14 A.L.R. 249.

Various other decisions of the Supreme Court of California are in accord. Leavitt v. Lassen Irrigation Co., 1909, 157 Cal. 82, 106 P. 404, 29 L.R.A.,N.S., 213; Limoneira Co. v. Railroad Commission, 1917, 174 Cal. 232, 162 P. 1033.

Decisions of the Supreme Court of the United States are in accord. Midland Realty Co. v. Kansas City Power & Light Co., 300 U.S. 109, 57 S.Ct. 345, 81 L.Ed. 540; Union Drygoods Co. v. Georgia Public Service Corp., 248 U.S. 372, 39 S. Ct. 117, 63 L.Ed. 309, 9 A.L.R. 1420. See also, Annotation 74 L.Ed. 234 reviewing both the California and Federal cases on this subject.

Plaintiff contends that it would be unfair for this court to declare the lease inoperative, and to hold it subject to the prescribed rates and regulations of the Public Utilities Commission. The rea-

son put forth is that plaintiff would not have entered into a lease of hangar space without having fixed with the City in advance the charges as to the common use facilities. This argument is without merit. If it were not a manufacturer might well argue that he would not have leased a factory for 20 years except for the fact that he was able to fix by contract the price of his electricity and water for the same period. Clearly if a contract had been entered into for these utility services at a fixed rate, subsequent regulation by the proper body, would affect the charges agreed upon.

The fact that the City is both the lesser of hangar space and the provider of the common use facilities does not change the holding in this case. The hangars are constructed and leased so that the customers of the City at the airport (the airlines) can better avail themselves of the common facilities offered. This in no way affects the holding that the airport, as far as the common use facilities are concerned, is offering a public utility service, the rates for which can be set by the Public Utilities Commission of San Francisco.

4. Commercial Frustration as a Defense.

The City as a distinct and separate defense contends that the "doctrine of commercial frustration" should apply in this case, thus enabling the City to avoid the lease agreement with plaintiff.

It is evident from the testimony and documentary evidence presented in this case that this defense is without merit.

In accordance with the foregoing it is ordered

1. That Trans World Airlines, Inc., account to the defendants and cross-complainants in this action as to the extent of its operations to and from San Francisco Airport from and after December 31, 1950.

2. That judgment be entered herein in favor of defendants, on findings of fact and conclusions of law, and that the injunction pendente lite be denied.

3. That judgment in favor of cross-complainants be entered herein in an amount to be determined. Counsel is directed to prepare findings of fact and conclusions of law in conformance with the opinion. Each party to pay its own costs.