## RHODE ISLAND COUNCIL 94, AFSCME, AFL–CIO

v.

## STATE of Rhode Island.

No. 96–558–Appeal.

Supreme Court of Rhode Island.

June 23, 1998.

Gerard P. Colbeigh, for plaintiff.

William E. Smith, Providence, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before the Court on appeal by the Rhode Island Council 94, AFSCME, AFL–CIO (union), from a judgment of the Superior Court vacating an arbitration award in its favor. The trial justice vacated the award on the ground that the arbitrator's construction of the collective-bargaining agreement (CBA) between the state and the union was irrational. According to the arbitrator's award, the state's statutory use of prison labor to accomplish work normally carried out by union members is a violation of the parties' CBA. In conjunction therewith the arbitrator concluded that prison inmates incarcerated at the Adult Correctional Institutions (ACI) who are engaged in bargaining-unit labor at the direction of the

Department of Corrections (DOC) are employees of the state within the meaning of the labor contract. For the reasons stated below, we affirm the judgment of the Superior Court vacating the arbitration award. The undisputed facts surrounding this appeal are as follows.

The union and the state were parties to a CBA from July 1, 1992, through June 30, 1995. The union is the sole and exclusive bargaining representative for all state employees within Rhode Island Council 94 with regard to wages, hours, and working conditions. Under the terms of the CBA the state is restricted in its right to assign work performed within an established bargaining unit to any employee outside that unit or to a subcontractor. Specifically, article 33 of the CBA, entitled "Sub–Contracting Procedure," provides in pertinent part:

"33.1 The State shall continue to provide work for employees in the bargaining units, and shall avoid, insofar as is practicable, the sub-contracting of work performed by employees in the bargaining unit on the date of this agreement, provided however:

"33.2 The State agrees that upon considering sub-contracting of any work presently performed by an employee which would have an adverse affect upon job security, wage rate, or classification status of any employee in the bargaining unit, it shall:

1) Notify the Union's Executive Director in writing of its intention six months in advance of sub-contracting, and

2) Whenever the State seeks and obtains bids from prospective sub-contractors, it shall, at least sixty days before binding itself to any sub-contracting agreement, notify the Executive Director of the Union that it has received the bids and shall grant the Union a reasonable opportunity to meet with the Director of Administration or other appropriate State Officials to discuss the advantages and disadvantages of sub-contracting and to develop a mutually acceptable plan for protecting the interests of any employees who will be affected."

Article 38.1, entitled "Non–Performance of Bargaining Unit Work," provides:

"Work normally performed within an established bargaining unit shall not be performed by any employee outside said bargaining unit, except in an emergency situation."

On March 10, 1993, the union filed a class-action grievance, contending that the state had violated these provisions by assigning job tasks "normally performed within an established bargaining unit" to prison inmates incarcerated at the ACI. It specifically contested the assignment to prisoners of janitorial work, general maintenance, groundskeeping, snow removal, custodial work, repair-shop work, and other tasks conducted at a number of state job sites. Accordingly the union sought to enjoin the prison assignments and reinstate union members to their former positions with back pay. It also sought to recover past dues that had been lost as a result of displaced union members.

A state hearing officer, in response, denied the union's grievance on the basis that "[p]risoners are not employees [within the meaning of the labor contract] and their use is not subcontracting." He concluded that the state's employment of prisoners is not a violation of the parties' CBA. Because the parties were unable to come to an agreement on the matter, the following inquiry was submitted to final and binding arbitration:

"Did the State violate the Collective Bargaining Agreement in the manner in which it allowed prisoners to work at State facilities as alleged in the grievance dated March 10, 1993? If so, what shall be the remedy?"

In support of the grievance union witnesses testified extensively regarding the use of prison inmates at various state job sites. Testimony indicated that from 1988 to 1993 inmates were replacing union employees in the performance of bargaining-unit work at the following state locations: the Cranston Street Armory, the Coventry National Guard Base, the Quonset Armory, the Aime Forand Building, Camp Fogarty, Colt State Park, and the state food-processing plant. Inmates were employed by the state to perform janitorial and watchman duties, grounds

maintenance, laundry and kitchen work. According to one witness, by 1988 the Rhode Island National Guard was using more than fifty prisoners to maintain its facilities, and by 1993 three janitorial positions in that agency had been abolished.

Witnesses for the state, on the other hand, testified that the union knew of its longstanding practice of employing inmates to perform unskilled labor at various state facilities and that this practice was even encouraged by some local union presidents. The state also asserted that no state employee had been adversely affected by the practice, although some had been transferred to other state departments or agencies. In addition the state contended that under G.L.1956 § 42–56–21[1] it had the right and obligation to rehabilitate incarcerated prisoners by employing them in forced labor as well as the option of having them engage in more expansive and voluntary work or education-release programs. The state argued that in these circumstances inmates are not employees of the state within the meaning of the labor contract.

Following a hearing on the matter, the arbitrator sustained the union's grievance, reasoning that the CBA specifically forbids the assignment of work performed within the represented bargaining unit to any employee outside that unit. Prison inmates, the arbitrator concluded, that are supervised by the DOC and directed by it to perform bargaining-unit work are state employees outside the represented bargaining unit. Thus their use by the state, she ruled, is violative of the CBA. Accordingly the arbitrator ordered the state to reinstate displaced and laid-off union members to their former positions and to reimburse them for lost wages and benefits. She denied, however, the union's request for compensation of back dues, finding that the state's actions were prompted by budgetary concerns and not by contempt for the union or its members.

The union thereafter filed a motion with the Superior Court to confirm the arbitration award while the state requested an order vacating the award and staying its implementation pending appeal. On July 31, 1996, the Superior Court granted the state's motion and vacated the arbitration award, ruling that the arbitrator's construction of the CBA was irrational. The Superior Court entered judgment in favor of the State on September 25, 1996. From this judgment the union filed a timely appeal to this Court.

I

Standard of Review

As a preliminary matter we acknowledge that judicial authority to review or to vacate an arbitration award is limited. "[A]bsent a manifest disregard of a contractual provision or a completely irrational result," the courts have no authority to vacate an arbitration award. *Rhode Island Brotherhood of Correctional Officers v. State Department of Corrections*, 707 A.2d 1229, 1234 (R.I.1998) (quoting *Town of Coventry v. Turco*, 574 A.2d 143, 146 (R.I.1990)); *Jacinto v. Egan*, 120 R.I. 907, 912, 391 A.2d 1173, 1176 (1978); *Belanger v. Matteson*, 115 R.I. 332,

1. General Laws 1956 § 42–56–21 provides in pertinent part:

"(a) All persons imprisoned in the adult correctional institutions on account of their conviction of any criminal offense * * * shall be let or kept at labor therein or on the institution lot or in some building thereon, for the benefit of the state, in such manner, under a contract and subject to such rules, regulations, and discipline as the director or his or her designee may make; provided, however, that for purposes of furthering the rehabilitation of persons concerned * * * and upon the approval of the director or his or her designee, an inmate imprisoned on account of his or her conviction of a criminal offense * * * may be permitted to work at paid employment for his or her own benefit or participate in a training or educational program within or without the state on a voluntary basis outside the institution lot at such time and under such conditions and restrictions as the director or his or her designee may impose and subject to recall by the director * * * as provided hereafter, while continuing as a prisoner at the adult correctional institutions, provided that:

(1) Representatives of local union central bodies or similar labor organizations are consulted;

(2) The paid employment will not result in the displacement of employed workers, to be applied in skills, crafts, or trades in which there is a surplus of available gainful labor in the locality, or impair existing contracts for services."

355–56, 346 A.2d 124, 137–38 (1975). A court therefore may not reconsider the merits of an award despite allegations that it rests upon errors of fact or on a misinterpretation of the contract. *United Paperworkers International Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286, 298 (1987). The courts' insulation of arbitration awards has been justified on the ground that broad judicial review in this area undermines the strong governmental policy encouraging the private settlement of labor grievances through the relatively inexpensive and expedient means of arbitration. *Id.*; *Exxon Corp. v. Esso Workers' Union, Inc.,* 118 F.3d 841, 844 (1st Cir.1997); *Rhode Island Council 94 v. State,* 456 A.2d 771, 773 n. 2 (R.I.1983); *Belanger,* 115 R.I. at 355–56, 346 A.2d at 138. As Justice White stated on behalf of a unanimous Supreme Court:

> "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. * * * If the courts were free to intervene on these grounds, the speedy resolution of grievances by private mechanisms would be greatly undermined." *Misco, Inc.,* 484 U.S. at 37–38, 108 S.Ct. at 370–71, 98 L.Ed.2d at 299.

Notwithstanding this deferential standard of review, a court may vacate an arbitration award that manifestly disregards a contractual provision or yields an irrational result. *See, e.g., Rhode Island Laborers' District Council v. State,* 592 A.2d 144, 146 (R.I.1991); *Turco,* 574 A.2d at 147; *City of Pawtucket v. Pawtucket Lodge No. 4, Fraternal Order of Police,* 545 A.2d 499, 504 (R.I.1988). Indeed the court is required to do so pursuant to G.L.1956 § 28–9–18(a)(2):

"[T]he court must make an order vacating the award * * * [w]here the arbitrator or arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was not made."

■ Thus awards purportedly resolving nonarbitrable issues must be set aside,[2] *Rhode Island Court Reporters Alliance v. State,* 591 A.2d 376, 379 (R.I.1991); *Vose v. Rhode Island Brotherhood of Correctional Officers,* 587 A.2d 913, 914–15 (R.I.1991), as well as awards tainted by fraud or deceit. *See* § 28–9–18(a)(1). In like manner an arbitration award not grounded in the contract between the parties or in those circumstances that comprise the "common law of shop" must be vacated. *See Jacinto,* 120 R.I. at 912, 391 A.2d at 1176; *see also Rhode Island Laborers' District Council,* 592 A.2d at 146 (arbitrator's reduction of discharge imposed by chief judge was in disregard of the CBA); *accord State v. National Association of Government Employees Local No. 79,* 544 A.2d 117, 119–20 (R.I.1988). Further, an award so palpably faulty that it fails to embody even a passably plausible interpretation of the contract must be struck down by the court upon review. *See, e.g., Turco,* 574 A.2d at 147–48 (arbitrators rewrote CBA and exceeded their authority by including sick-leave pay as part of an officer's base pay for pension purposes when CBA did not provide for such action); *Pawtucket Lodge No. 4,* 545 A.2d at 504 (arbitrator's award to union was inappropriate creation of beneficiary not drawn from essence of agreement).

■ Clearly an arbitrator's broad authority to interpret the agreement between the parties and fashion an appropriate remedy is not unbridled. His or her authority is contractual in nature and is limited to the powers conferred in the parties' CBA. The arbitrator is confined to interpret the terms of the agreement so as to effectuate the intentions of the parties to the contract. As Mr.

---

2. Whether an issue is arbitrable is a question of law to be reviewed by the court de novo. *Rhode Island Brotherhood of Correctional Officers v. State Department of Corrections,* 707 A.2d 1229, 1234 (R.I.1998). Our review of the issue of arbitrability, therefore, should not be equated

with the deference due the arbitrator's interpretation of the contract that is at issue in the present case. *Providence Teachers' Union Local 958–American Federation of Teachers v. Providence School Committee,* 433 A.2d 202, 205 (R.I. 1981).

Justice Douglas observed in *United Steel-workers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960):

"[The arbitrator] does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Id.* at 597, 80 S.Ct. at 1361, 4 L.Ed.2d at 1428.

█ Our role on appeal, therefore, like that of the Superior Court below, is to determine whether the arbitrator has rationally resolved the grievance by considering the contract between the parties and the circumstances out of which come the so-called common law of the shop. *Jacinto,* 120 R.I. at 912, 391 A.2d at 1176.

## II

### Did the Superior Court Justice Err in Vacating the Arbitration Award?

The union argues on appeal that the Superior Court justice erred in vacating the arbitration award by failing to apply the correct standard of review and substituting his own interpretation of the labor contract for that of the arbitrator. We disagree.

Our review of the record reveals that the trial justice carefully and correctly applied the proper standard in his review of the arbitrator's decision. Citing language from this Court, the trial justice observed that "[a]n arbitration award will be confirmed if it 'draws its essence' from the contract and is based upon a 'passably plausible' construction of the contract." *Rhode Island Brotherhood of Correctional Officers,* 707 A.2d at 1234; *Jacinto,* 120 R.I. at 912, 391 A.2d at 1176. "The award will be upheld," stated the trial justice, "even if the arbitrator commits an error of law, so long as the law is not manifestly disregarded." However, the trial justice also observed that an arbitration award cannot stand if it embodies an irrational result, forms an illegal contract, or

violates clearly defined public policy. *See, e.g., Rhode Island Brotherhood of Correctional Officers,* 587 A.2d at 915–16; *Turco,* 574 A.2d at 147–48.

In the case before us the critical issue is whether prison inmates laboring at the direction of the DOC pursuant to § 42–56–21 are employees of the state when they are engaged in tasks customarily carried out by union employees. The trial justice held unequivocally that they are not and that the arbitrator reached an irrational result by finding that they were. In arriving at this conclusion, the trial justice carefully examined the decision of the arbitrator in the context of the parties' CBA. Consequently the union's assertion that the trial justice applied a less deferential standard of review in vacating the arbitration award is without merit. The trial justice's statement that "no reasonably literate person would seriously choose to use the word 'employee' in the English language to describe the status of three-dollar-per-day prisoners laboring involuntarily for the State" clearly expresses a finding that the arbitrator's decision was irrational and not a passably plausible interpretation of the agreement.

We begin our review with an examination of the plain language of article 38.1 and the arbitrator's interpretation of that provision. Article 38.1 provides:

"Work normally performed within an established bargaining unit *shall not be performed by any employee outside said bargaining unit,* except in an emergency situation." (Emphasis added.)

Applying this provision to the facts of the present case, the arbitrator ruled that prison inmates were being directed by the state to perform bargaining-unit labor despite their status outside the bargaining unit of Council 94. She further determined that because the DOC supervises the prisoners in the performance of their duties, they constitute employees of the state within the meaning of the contract. Specifically she found that

*"the term 'employee' is also reasonably defined by the supervision of the individual.* In this case, prison inmates receive their direction from the State of Rhode

Island through the DOC while performing the tasks in question and therefore the work being performed is subject to the scrutiny of Article 38." (Emphasis added.)

Previous arbitrators have determined that the ordinary meaning of the term "employee" means "employees of the employer." *See, e.g., R.I. Council 94, AFSCME and State of Rhode Island,* AAA No. 10–390–0087–94 at 7 (1994) (Arb.Grossman) ("[t]he term 'employee' usually refers to employees of the employer"); *AFSCME, Local 2870 and State of Rhode Island,* AAA No. 1139–1831–83 (1985) (Arb. Dorr III) ("the term 'employee' * * * refers to other State employees, and not to any person who is not in the bargaining unit, whether in or out of the State's service"). In this case the arbitrator found that restricting the term "employee" to its plain and ordinary meaning would "lead[ ] to the * * * absurd result of permitting the state to assign work normally reserved for Council 94 members to individuals who are unemployed or employed outside of State service."

■ Conversely the trial justice determined that "employee" within the meaning of article 38.1 must of necessity refer to employment by the state because if the term were to have any other meaning, the subcontracting provision of article 33 would apply. We agree. The provisions of the parties' CBA cannot be read in isolation but must be viewed in the context of the entire contract, with due regard being given to the purpose each provision provides. *Turco,* 574 A.2d at 147. Plainly, the purpose of article 38.1 is to prevent any state employee who is not a member of the represented bargaining unit

from performing bargaining-unit work. The purpose of article 33, on the other hand, is to limit the state's ability to employ persons outside state service from doing bargaining-unit work.[3] Article 33 limits the authority of the state by requiring it to notify the union of its intent to hire subcontractors when subcontracting would adversely affect the job security, wage rate, or classification status of bargaining-unit members. The trial justice's determination that employee means "employees of the employer" therefore effectuates the purpose served by each respective contractual provision of the labor agreement.

In further testing the rationality of the arbitrator's award, the trial justice looked to the decisions of other courts and administrative agencies that have considered the employee status of prisoners laboring for the state, albeit in other settings. In a vast majority of the cases considering the issue the agency or court ruled that prisoners who provide services for the government that imprisons them are not employees of that government.[4] *See Miller v. Dukakis,* 961 F.2d 7, 9 (1st Cir.), *cert. denied,* 506 U.S. 1024, 113 S.Ct. 666, 121 L.Ed.2d 590 (1992) (explaining that inmates were not employees within the meaning of the Fair Labor Standards Act); *accord Villarreal v. Woodham,* 113 F.3d 202 (11th Cir.1997); *Nicastro v. Reno,* 84 F.3d 1446 (D.C.Cir.1996); *Burleson v. State of California,* 83 F.3d 311 (9th Cir.1996); *Danneskjold v. Hausrath,* 82 F.3d 37 (2nd Cir. 1996); *Reimonenq v. Foti,* 72 F.3d 472 (5th Cir.1996); *McMaster v. State of Minnesota,* 30 F.3d 976 (8th Cir.1994), *cert. denied,* 513 U.S. 1157, 115 S.Ct. 1116, 130 L.Ed.2d 1080

---

3. The text of article 33 relevant to our discussion may be found on page 586 of this opinion.

4. Courts have disagreed, however, on the status of inmates working outside the penitentiary for a *private employer* as part of a *work-release program. See, e.g., Watson v. Graves,* 909 F.2d 1549 (5th Cir.1990) (prisoners are employees of *private work-release employers* under the Fair Labor Standards Act); *National Welders Supply Co., Inc.,* 145 N.L.R.B. 948 (1964) (board does not regard prisoners as employees under work-release employers); *but see Speedrack Products Group, Ltd. v. N.L.R.B.,* 114 F.3d 1276, 1282 (D.C.Cir.1997) (board's determination that completely integrated work-release inmates who share the same wages, benefits, and other condi-

tions of employment are not eligible to vote in represented election was unreasonable); *see also Equal Employment Opportunity Commission Opinion No. 86–7,* 40 F.E.P. 1892 (April 18, 1986) (prison laborer is not an employee of prison under Title VII); *c.f. Baker v. McNeil Island Corrections Center,* 859 F.2d 124, 128–29 (9th Cir.1988) (prison inmates could be employees under Title VII). In a voluntary work release program the inmates' relationship with the private employer more closely approximates the traditional employer-employee relationship because placement is voluntary and involves private employers who pay fair market wages. In contrast, prisoners in the instant case are laboring for the DOC involuntarily at a rate of $3 per day.

(1995); *Harker v. State Use Industries,* 990 F.2d 131 (4th Cir.), *cert. denied,* 510 U.S. 886, 114 S.Ct. 238, 126 L.Ed.2d 192 (1993); *Vanskike v. Peters III,* 974 F.2d 806 (7th Cir. 1992), *cert. denied,* 507 U.S. 928, 113 S.Ct. 1303, 122 L.Ed.2d 692 (1993); *see also McCaslin v. Cornhusker State Industries,* 952 F.Supp. 652 (D.Neb.1996) (inmate was not employee under Title VII); *Lanford v. City of Sheffield,* 689 So.2d 176 (Ala.Civ.App. 1997) (municipal prisoner was not employee for workers' compensation purposes); *accord Keeney v. Industrial Commission,* 24 Ariz. App. 3, 535 P.2d 31 (1975); *Orr v. Industrial Commission of the State of Colorado,* 716 P.2d 1106 (Colo.1986); *Schraner v. State Department of Correction,* 135 Ind.App. 504, 189 N.E.2d 119 (1963); *Frederick v. Men's Reformatory,* 203 N.W.2d 797 (Iowa 1973); *Commonwealth Department of Education, Division of Surplus Properties v. Smith,* 759 S.W.2d 56 (Ky.1988); *Porter v. Department of Corrections,* 876 S.W.2d 646 (Mo.Ct.App. 1994); *Drake v. County of Essex,* 192 N.J.Super. 177, 469 A.2d 512 (1983); *Reid v. New York State Department of Correctional Services,* 54 A.D.2d 83, 387 N.Y.S.2d 589 (1976); *Republic–Franklin Insurance Co. v. City of Amherst,* 50 Ohio St.3d 212, 553 N.E.2d 614 (1990); *Staley v. City of Oilton,* 919 P.2d 463 (Okla.App.1996); *Spikes v. State,* 458 A.2d 672 (R.I.1983); *Howard v. Uselton,* 774 S.W.2d 925 (Tenn.1989); *Kofoed v. Industrial Commission of Utah,* 872 P.2d 484 (Utah Ct.App.1994); *Commonwealth v. Woodward,* 249 Va. 21, 452 S.E.2d 656 (1995); *Kopacka v. Department of Industry, Labor & Human Relations,* 49 Wis.2d 255, 181 N.W.2d 487 (1970).

One of the cases considered by the trial justice in vacating the arbitration award involved the applicability of the Rhode Island Workers' Compensation Act (WCA), G.L. 1956 chapter 29 of title 28, to prison inmates employed by the state. *Spikes v. State,* 458 A.2d 672 (R.I.1983). In *Spikes* this Court determined that an inmate laboring pursuant to § 42–56–21 is not an employee of the state within the meaning of the act. *Id.* at 674. We held that

"in order to establish an employer-employee relationship, there must be an express or implied contract for hire. * * * This implies that services performed must be voluntary on the part of the employees. Wages must be paid and the two parties must be capable of giving their consent to enter into the relationship." *Id.*

Inmates, we concluded, are assigned "work details" pursuant to § 42–56–21 and are required to labor for the state at the direction of the DOC as part of their confinement. *Spikes,* 458 A.2d at 674. The purpose of the statute is rehabilitation. There is *"no language in the statute that creates an employer-employee relationship during the term of confinement." Id.* (Emphasis added.) It is precisely because the relationship between an inmate and the state is involuntary, we held, that the requirements necessary to establish a "contract for hire" are lacking. *Id.* Ultimately an inmate has no choice in accepting or rejecting the labor relationship. *Id.; see also Durand v. City of Woonsocket,* 537 A.2d 129 (R.I.1988) (a participant in a state-mandated work-fare program is not an employee within the meaning of the WCA); *accord Closson v. Town of Southwest Harbor,* 512 A.2d 1028 (Me.1986).

Here the arbitrator's interpretation of the CBA equating prisoners with state employees so as to preclude them from performing many unskilled tasks greatly undermines if not eviscerates the director's authority to rehabilitate prisoners under the statute. Essentially the director is stripped of his obligation to keep prisoners "at labor * * * for the benefit of the state, in such manner, under a contract and subject to such rules, regulations, and discipline as the director * * * may make." Section 42–56–21(a). In comparable circumstances this Court has held that the statutory powers and obligations of the state cannot be contractually abdicated. *Brotherhood of Correctional Officers,* 587 A.2d at 915 (CBA was invalid because it conflicted with the statutory power of the director of the DOC to require correctional officers to work involuntary overtime); *see also State Department of Mental Health, Retardation, and Hospitals v. Rhode Island Council 94,* 692 A.2d 318, 324–25 (R.I. 1997) (department has statutory responsibility to provide for the health and safety of its

patients and may not arbitrate whether employees can decide for themselves how many consecutive hours of overtime they will work); *Pawtucket School Committee v. Pawtucket Teachers' Alliance, Local No. 930,* 652 A.2d 970, 972 (R.I.1995) (school committee cannot bargain away its responsibility of evaluating bilingual language programs for state law compliance). We hold that the arbitrator's expansive interpretation of the term "employee" resulted in an impermissible restriction of the statutory powers of the director of the DOC to rehabilitate incarcerated individuals.

In an analogous case before this Court, interns at a public television station were precluded from joining an established bargaining unit on the basis that they did not share with other employees mutual interests in wages, hours, and other conditions of employment. *Rhode Island Public Telecommunications Authority v. Rhode Island State Labor Relations Board,* 650 A.2d 479, 487 (R.I.1994). Our decision was based in part on previous arbitration awards that had determined that individuals involved in training programs are *not* state employees for collective-bargaining purposes. *Id.* at 488 n. 1. In *In re State of Rhode Island Department of Social and Rehabilitative Services and Rhode Island Council 94, AFSCME, Local 2882,* Case No. 1139–1393–83 (1984) (Arb.Fallon), the union charged the state with violating a provision of the CBA that precluded non-bargaining-unit employees (trainees) from performing bargaining-unit work. The arbitrator concluded that the trainees were not employees within the meaning of the contract because trainees were "not hired through regular hiring procedures, receive no standard fringe benefits, and [were] paid * * * an amount so small that it cannot reasonably be called a salary comparable to [s]tate employee wages." *Id.* at 11.

Likewise in *In re R.I. Council 94, AFSCME, Local 2879 and State of Rhode Island,* Case No. 1139–2298–82 (1985) (Arb.Jerue), the union sought to have work-study students at Rhode Island College classified as state employees and barred from performing bargaining-unit work on the basis

that their use violated the labor contract. The arbitrator held that the state's long-standing work-study program did not violate the contract, partly because the students' "compensation is considerably less than regular state employees." *Id.* at 5. The National Labor Relations Board, we noted, also excludes student trainees from collective-bargaining units because they do not enjoy the same conditions of employment as other employees. *Rhode Island Public Telecommunications Authority,* 650 A.2d at 488 n. 1; *see, e.g., Pawating Hospital Association,* 222 N.L.R.B. 672, 673 (1976) (part-time students employed at hospital through school program are excluded from bargaining unit because they receive lower pay, work fewer hours, and enjoy no fringe benefits); *Barnard College,* 204 N.L.R.B. 1134, 1135 (1973) (university students working as graduate assistants and part-time support staff excluded from bargaining unit).

Each of the reasons relied upon by these arbitrators for denying trainees and interns employee status for collective-bargaining purposes apply with even greater force when the individuals to be classified are prison laborers. Principally the wages received by prison inmates ($3 per day) are significantly less then the compensation paid to regular state employees. The prisoners go through no hiring procedures, work different hours, receive no fringe benefits, and cannot refuse the labor relationship. They must be supervised by the state, not because they are employees, but because they have been convicted of committing a crime.

Further, we find no basis in the language of the CBA or in § 42–56–21 that would support a finding that prison inmates laboring for the state are to be treated as unrepresented state employees. Indeed every logical inference has historically been to the contrary. Employment of prisoners at hard labor existed before the adoption of the Rhode Island Constitution. *Anderson v. Salant,* 38 R.I. 463, 475, 96 A. 425, 429–30 (1916). The first act specifically authorizing the employment of prisoners outside a penitentiary in the State of Rhode Island was enacted in 1847. 1847 R.I. Acts & Resolves p. 48, § 4. By 1916 the validity of prison-

labor contracts within the state was well established and rarely challenged. *Anderson,* 38 R.I. at 476, 96 A. at 430. Up until the present case no court or administrative agency within this jurisdiction has classified inmates laboring for the benefit of the state pursuant to the work requirement of § 42–56–21 as employees of the state.

The arbitrator in this case found that the state and the union had been fighting over the displacement of union workers by prison laborers since 1980 and that arbitrators and grievance officers charged with resolving similar disputes have rendered conflicting results. Despite being aware of this conflict and the long-standing nature of the state's practice, the union never successfully negotiated language in the 1992 CBA expressly barring prisoners from performing bargaining-unit work. In the face of this controversy the union would have us believe that the state impliedly contracted to have prison laborers classified as employees for collective-bargaining purposes. We find such a strained interpretation of the parties' CBA implausible.

The union nonetheless contends that two previous decisions by state hearing officers' precluding the use of prison labor supports the rationality of the arbitrator's award.[5] First the arbitrator discussed a 1980 decision in which a hearing officer ordered the state to transfer two prisoners assigned to the Ladd Center storeroom as part of a work-release program to tasks "not normally done by bargaining unit employees." Second, the arbitrator reviewed a state hearing officer's decision sustaining the union's grievance challenging the use of inmates to fill potholes and to pick up litter from state grounds on the basis that those duties are normally carried out by bargaining-unit members. However, neither of these decisions construed the term "employee" to include prison laborers. The arbitrator noted that several subsequent grievances challenging the state's use of prison labor have been unsuccessful. In 1989 a state hearing officer denied the union's grievance challenging the use of prisoners to

maintain the grounds at the Department of Mental Health, Retardation, and Hospitals. The state hearing officer denied the grievance on the basis that the action had no adverse affect on the status or wage of any union employee. For the same reason the state denied the union's objections to the DOC's use of inmates at the state garage, facilities office, and prison laundry. In *Rhode Island Laborers' District Council, Local Union 808 and State of Rhode Island (Department of Transportation),* AAA Case No. 11–390–2229 94 (1995) (Arb.Dolan), a grievance decided five months before the instant arbitration award was rendered, the arbitrator ruled that the state's use of prison labor to remove graffiti from state roads and bridges did not constitute a violation of the parties' CBA. The arbitrator concluded that the state's actions did not adversely affect union employees. In addressing a contractual provision identical to that of section 38.1, the arbitrator stated that:

> "there is a fundamental question of whether inmates can be considered as employees at all. The inmate graffiti removal program is not administered by the [Department of Transportation]. Instead, DOC runs it pursuant to the work requirement contained in R.I. Gen. Law § 42–56–21. Both the statute and common sense suggest that the $3 daily pay inmates receive is not a wage in exchange for labor in the traditional sense of employment. Unlike the work release program the statute also covers, *inmates are not doing this work voluntarily* or for any significant sum of money that is typical of an employment relationship. *They are not in prison to provide this labor; they are there because they have been convicted of committing a crime.* Additionally, the statute is not an employment provision; it is a rehabilitation provision. Work is being specifically created for inmates to perform in that rehabilitation attempt. The $3 is not a traditional wage in exchange for labor; it is part of that rehabilitation attempt." *Id.* at 14–15. (Emphases added.)

---

5. The state hearing officers' decisions adverted to by the parties and discussed by the arbitrator in her decision were not made a part of the record

on appeal. Consequently, we will rely upon the arbitrator's characterizations of said decisions in our discussion.

Contrary to the position asserted by the union, therefore, the state has not agreed by its actions to extend the plain and ordinary meaning of the term "employee" to encompass prison labor. Rather the preceding cases illustrate the development of the dispute since 1980 and the parties' respective positions on how the matter should be resolved. At a minimum the record reveals that at the time the parties negotiated the terms of the 1992 CBA, the state continued to use forced inmate labor to perform tasks customarily carried out by bargaining-unit members.

■■■ We are of the opinion, therefore, that the arbitrator's distended definition of the term "employee" substantially expanded the state's obligations under the CBA, materially altering and essentially rewriting the agreement existing between the parties. *See Turco*, 574 A.2d at 147–48 (arbitrators improperly rewrote CBA by including sick-leave pay as part of base pay for pension purposes when no provision specifically provided for such an action). In her decision the arbitrator disregarded the plain and ordinary meaning of the word "employee," concluding alternatively that the supervision of an individual by another is sufficient to create an employer-employee relationship. Supervision, however, forms but one small component part of the multifarious employment relationship. The employer-employee relationship must, at a minimum, consist of a voluntary association entered into by both parties for reasons that are mutually beneficial. *See Spikes*, 458 A.2d at 674. Because the prisoner's association with the state is involuntary, the requirements necessary to establish an employer-employee relationship cannot be met. *Id.*

■■■ We do not by this opinion endeavor to replace the arbitrator's interpretation of the CBA with our own. Rather we are constrained to recognize those instances in which an arbitrator reaches beyond the terms of the parties' CBA for the purpose of rendering what he or she believes is a more desirable result. *See, e.g., Rhode Island Laborers' District Council*, 592 A.2d at 146; *Turco*, 574 A.2d at 147–48; *Pawtucket Lodge No. 4*, 545 A.2d at 504; *National Association of Government Employees Local No. 79*, 544

A.2d at 119–20. Although an arbitrator must resolve ambiguities surrounding the scope of the language employed in a CBA, he or she may not "ignore clear-cut contractual language" or assign to that language a meaning other than that which is plainly expressed. *See* Elkouri & Elkouri, *How Arbitration Works*, 482–83 (5th ed.1997). Such amendment by interpretation effectively "usurp[s] the role of the labor organization and employer" in the collective-bargaining process. *Id.*

In her decision the arbitrator also concluded that the state violated the subcontracting provisions of article 33 by assigning to prison inmates tasks carried out by bargaining-unit members. Article 33 requires the state to avoid, insofar as is practicable, the subcontracting of bargaining-unit work. If the subcontracting of bargaining-unit work adversely affects an employee in the bargaining unit, the state must provide six months advanced written notification to the union's executive director. The arbitrator concluded that because the employment of prison labor had an adverse impact on bargaining-unit members, the state violated the requirements of article 33 by failing to provide notice to the union of its intent to subcontract.

The ruling of the arbitrator assumes that prison laborers engaged in bargaining-unit work are subcontractors. This Court has defined a subcontractor as

"[o]ne who has entered into a contract, express or implied, for the performance of an act with the person who has already contracted for its performance." *Diamond International Corp. v. Bristol County Builders Corp.*, 468 A.2d 282, 285 (R.I. 1983) (quoting Black's Law Dictionary 1277 (5th ed.1979)). (Emphasis added.)

In order to qualify as a subcontractor under this definition, one must possess the power to enter into a contract for hire. For the reasons discussed above, a prison inmate laboring for the state pursuant to § 42–56–21 has no power to accept or to reject the labor relationship.

■■■ Furthermore any agreement between the DOC and another state department is not a contract for want of sufficient parties. It is elementary that there must be at least two parties to every contract and

that one cannot contract with or be bound to oneself. *See, e.g., Kumberg v. Kumberg,* 232 Kan. 692, 659 P.2d 823, 830–31 (1983) (contract entered into between owner and owner's sole proprietorship is not valid); *accord Forest Investment Corp. v. Chaplin,* 55 Ill. App.2d 429, 205 N.E.2d 51, 53–54 (1965); *see also Yosemite Portland Cement Corp. v. State Board of Equalization of California,* 59 Cal.App.2d 39, 138 P.2d 39, 41 (1943) (a city may not contract with one of its own departments); Restatement (Second) *Contracts* § 9 (1979) ("[t]here must be at least two parties to a contract, a promisor and a promisee"). Any agreement between the DOC and another state department to supply prisoner labor involves a single entity, the state. Hence no enforceable contract can result.

■ In conclusion we are of the opinion that the arbitrator exceeded her authority by classifying prison inmates as state employees and by determining that the state could form a contract with itself. Accordingly the Superior Court properly vacated the arbitration award on the basis that the award failed to draw its essence from the parties' CBA and was not a passably plausible interpretation of the contract.

For the reasons stated, the union's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers in the case are remanded to the Superior Court.