[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
On June 2, 2003, the City of Cranston ("City") repealed two ordinances, one which provided pension benefits for retirees of the International Brotherhood of Police Officers, Local 301 ("Union" or "Local 301"), entitled Ordinance 96-56, and one which provided pension benefits for retirees of the International Association of Fire Fighters, Local 1363 ("Union or "Local 1363"), entitled Ordinance 96-54. The International Brotherhood of Police Officers, through their Union, challenged the repeal of Ordinance 96-56 as a violation of their collective bargaining agreement ("CBA") and arbitration ensued.[1]
Similarly, the International Association of Fire Fighters, through their Union, challenged the repeal of Ordinance 96-54 as a violation of their collective bargaining agreement ("CBA") and arbitration ensued.[2] Upon return of two arbitration decisions favorable to the Unions, the City seeks to vacate these arbitration awards.[3] Jurisdiction is pursuant to G.L. 1956 § 28-9-18.
 Facts and Travel
Local 301
The City and the International Brotherhood of Police Officers, Local 301 are parties to a collective bargaining agreement that commenced on July 1, 2002, and that will remain effective through June 30, 2005. The CBA contains the terms and conditions of employment of police officers employed by the City, including the pension benefits to be provided to them upon their retirement. In addition to the CBA, the City has also codified in ordinances the pension benefits to be granted to officers upon their retirement.
At the arbitration hearing, former Mayor Michael Traficante ("Mayor Traficante") testified that fiscal instability in the City's pension plan began to build during the 1980's as a result of a massive unfunded liability in the plan caused by the failure of the City to properly fund it over a period of many years. That instability caused several of the City's bond rating agencies to warn that the City must address the unfunded pension liability, with an eye toward resolving it, or risk a lowering of the City's bond rating. In response to that pressure, the City requested that Local 103 renegotiate the collective bargaining agreement that had already been agreed to by the parties and was to remain in effect from July 1, 1994 through June 30, 1997. The parties, however, failed to execute a collective bargaining agreement prior to June 30, 1997, which would have superceded the terms of the contract already in effect through that date.
Notwithstanding the failure of the parties to execute a new contract as a result of their concession bargaining, on November 25, 1996 the City Council enacted Ordinance 96-56, which amended the benefits contained in the prior police pension ordinance. In addition to incorporating provisions of the previous pension ordinance, the new ordinance provided that certain officers who retired from the police department between July 1, 1995 and June 30, 1996, were entitled to receive a severance payment of $500.00 per year of service upon their retirement.
Moreover, Ordinance 96-56 also included a new provision, which provided that, in years in which active police officers received a salary increase of less than 3%, retirees would receive a minimum automatic increase in their annual pension payment of 3%. This provision modified a pre-existing benefit pursuant to which the City was required to pay to retirees an automatic increase in their pension payments equal to the salary increase received by active police officers.
At the arbitration hearing, Anthony Capezza, Jr., a former police officer who retired from the Cranston Police Department on January 6, 1996, testified that, beginning in the year after Ordinance 96-56 was enacted, each year (until its repeal) he received the annual escalator payment provided for in the ordinance, including the minimum 3% escalation in several years in which active police officers received a salary increase of less than 3%.
Although the collective bargaining agreement in effect when Ordinance 95-56 was passed was set to expire several months thereafter, the parties were unable to reach agreement on a new contract. As a result, the parties submitted to interest arbitration, as prescribed by Rhode Island law. Prior to the conclusion of the interest arbitration process, however, the parties again commenced negotiations and they ultimately agreed upon the terms of a contract for the period from 1997-1999, as well as a collective bargaining agreement to cover the period from 1999-2002. Steven Antonucci ("Antonucci"), the Master-at-Arms of the Union at the time and a member of the negotiating team, testified at the arbitration hearing that both of these contracts were then executed by the parties on the same day, July 20, 2000.
Antonucci noted that both contracts executed on July 20, 2000 also incorporated by reference a "memorandum of understanding" that was executed by both parties on that date, which listed all of the pension benefits to which retiring police officers were entitled ("Memorandum of Understanding"). The Memorandum of Understanding, Antonucci testified, contained essentially all of the benefits contained in Ordinance 95-56, as well as a few additional pension provisions that had been provided for in the 1994-1997 collective bargaining agreement, but removed from the subsequent agreement. Antonucci testified that he was uncertain whether the Memorandum of Understanding was ratified by the City, but he knew that the 1997-1999 and 1999-2002 contracts had been ratified. The Memorandum of Understanding has also been incorporated by reference into the CBA.
In January 2003 a new administration took over in Cranston, led by Mayor Stephen P. Laffey. Also at that time, several new City Councilors were elected, which significantly changed the composition of that body. Shortly thereafter, the City Council, in concert with the administration, began the process of revising Ordinance 95-56. As a result of that process, the City Council enacted Ordinance 03-32 on June 2, 2003, which repealed Ordinance 95-56 and provided for revised benefits and other terms of retirement. Significantly, Ordinance 03-32 contained no reference to the pension benefits contained in the Memorandum of Understanding. On June 5, 2003, Ordinance 03-32 became effective and Ordinance 96-56 was officially repealed.
Also on June 5, 2003, the Union filed a grievance on behalf of Sergeant Russell Henry, an active police officer and the Union business agent, over the repeal of Ordinance 96-56. The City denied the grievance and the Union subsequently filed a demand for arbitration of the dispute on June 18, 2003.
At the close of the fiscal year on June 30, 2003, former police officers who had retired pursuant to the terms contained in Ordinance 96-56 and/or the Memorandum of Understanding (that is, on or after November 25, 1996) were entitled to receive an automatic pension increase of 3%. The City made this payment to all such individuals. In addition, former officers who had retired prior to the effective date of the Memorandum of Understanding and/or Ordinance 96-56 ("pre-11/25/96 retirees") had been entitled, pursuant to the terms of that ordinance, to receive the pension benefits contained therein, during the time period when that ordinance had been in effect (i.e. through June 5, 2003). Therefore, the City paid all pre-11/25/96 retirees the automatic 3% pension increase through June 5, 2003. The City sent correspondence to all pre-11/25/96 retirees, explaining the resulting change in their pension payment.
As a result of this repeal, the Union sought arbitration on behalf of Local 301. A hearing on the grievance filed by Local 301 was heard before Arbitrator Gary D. Altman ("Altman") on December 2, 2003. In his award, issued on February 13, 2004, Altman ruled as an initial matter that "[t]he Union has standing to pursue the present grievance, since the Union under the terms of the agreement has the right to initiate grievances." In addition, Arbitrator Altman ruled that the grievance "is [substantively] arbitrable[,] as the grievance alleges a violation of a specific provision of the parties' Agreement." Finally, Arbitrator Altman sustained the Union's grievance, ruling that "the City violated Section 24(1) [of the CBA] when it repealed Ordinance 96-56." As a result, Altman ordered the City to "continue to provide the retiree benefits set forth in Ordinance 96-56" and to "make whole all former employees who were denied the benefits of the escalation clause by the action of the City Council when it repealed Ordinance 96-56."
The City proceeded to file a Complaint in the Nature of an Application pursuant to § 28-9-18 to Vacate and Stay Arbitrator Altman's Award as well as a Motion to Stay the implementation of the Altman Award until such time as this Court rules on the City's Complaint. On March 23, 2004, this Court entered an Order staying the implementation of the Altman Award pending its ruling on the merits of the City's appeal.
Local 1363
The City and the International Association of Fire Fighters, Local 1363, are parties to a collective bargaining agreement that commenced on July 1, 2001, and was to remain effective though June 30, 2004. The CBA contains the terms and conditions of employment of firefighters employed by the City, including the pension benefits to be provided to them upon retirement.
In addition to the CBA, the City has also codified in ordinances enacted by the City Council, the pension benefits to be granted to firefighters upon their retirement. After the passage of the Firefighter's Arbitration Act, the Union was certified as the exclusive representative of the uniformed and civilian employees of the City's fire department. At some point thereafter, the pension benefits to be paid to retiring firefighters as set forth in City ordinances were also incorporated into the collective bargaining agreement negotiated by the City and the Union.
At the arbitration hearing, Mayor Traficante testified regarding the history of the pension plan. He testified that City officials first began to recognize that the pension system had become fiscally unsound during the administration of the preceding Mayor, Edward DiPrete. By that time, Mayor Traficante recalled, the "pay-as-you-go" policy followed by the City with respect to its pension plan had caused the City's annual expenditures for the plan to escalate far beyond the annual appropriations made to finance the plan. As a result, the DiPrete administration established a trust to which the City would annually appropriate funds to be invested and used to offset the unfunded liability of the pension plan.
Mayor Traficante testified that by the early 1990's the continuing instability of the pension plan caused several of the City's bond rating agencies to warn that the City's bond rating would fall if no action was taken to address the unfunded pension liability. In response to that pressure, Mayor Traficante testified, the City requested that Local 1363 renegotiate the terms of the pension plan that was provided to retiring firefighters.
On November 25, 1996, the City Council enacted Ordinance 96-54, which amended the benefits contained in the prior fire pension ordinance. In addition to incorporating the provisions of the previous pension ordinance, the new ordinance provided that all firefighters who retired from the department between July 1, 1995 and June 30, 1996 were entitled to receive a severance payment of $500.00 per year of service upon their retirement. Moreover, Ordinance 96-54 also included a new provision, which provided that, in years in which active firefighters received a salary increase of less than 3%, retirees would receive a minimum automatic increase in their annual pension payment of 3%.
Traficante testified at the arbitration hearing that, after the passage of Ordinance 96-54 by the City Council, he immediately moved, with the assistance of City Solicitor Thomas DiSegna, to incorporate the terms of the ordinance into the 1994-1997 collective bargaining agreement then in effect between the City and Local 1363. According to Traficante, this action was necessary because the contract had to be rewritten to incorporate the negotiations over the terms of the pension plan that were included in Ordinance 96-54.
Paul Reed ("Reed"), a former president of Local 1363, testified that the pension terms added to the second version of the 1994-1997 collective bargaining agreement (with only minor revisions) were then included within all subsequent contracts between the City and Local 1363, all of which were duly ratified by the City Council. Moreover, Reed acknowledged that throughout the time that Ordinance 96-54 remained in effect, the City properly paid all retirees, regardless of the date of their retirement, the pension benefits contained in the ordinance, including the 3% annual increase.
On June 2, 2003, the new City Council enacted Ordinance 03-33, which repealed Ordinance 96-54 and provided for revised benefits and other terms of retirement. Significantly, Ordinance 03-33 did not provide for the generous pension benefits contained in Ordinance 96-54. On June 5, 2003, Ordinance 03-33 became effective and Ordinance 94-54 was officially repealed.
At the close of the fiscal year on June 30, 2003, former firefighters who had retired pursuant to the terms contained in Ordinance 96-54 and/or the CBA received an automatic pension increase of 3%. In addition, former firefighters who had retired prior to January 1, 1995 and/or the enactment of Ordinance 96-54 received the pension benefits contained in Ordinance 96-54 through June 5, 2003. The City paid all pre-1/1/95 retirees the automatic 3% pension increase through June 5, 2003, and sent correspondence, dated June 24, 2003 to all former firefighters who had retired prior to January 1, 1995, explaining the resulting change in their pension payment.
On July 28, 2003, the Union filed a grievance with the City, alleging that "the City's June 24, 2003 letter to retirees . . . violated the [CBA] and past practices of the parties." As a result, Local 1363 filed a demand for arbitration of the dispute on September 14, 2003.
An arbitration hearing to decide the Grievance was heard before Arbitrator Parker Denaco ("Denaco") on January 15, 2004. On March 16, 2004, Denaco issued his award. In his award, Arbitrator Denaco ruled as an initial matter that "[t]he City's objection(s) to these proceedings, based on issues of substantive arbitrability are denied." In addition, Denaco ruled that the grievance "is [substantively] arbitrable[,] as the grievance alleges a violation of a specific provision of the parties' Agreement." Denaco also found that "[t]he Union had standing to bring, process and pursue this grievance under the [CBA]." Finally, Denaco concluded that "the City violated the collective bargaining agreement . . . by enacting Ordinance 03-33 which, in turn, repealed Ordinance 96-54. As a remedy for the breach, Arbitrator Denaco ordered, "The City shall restore benefits to and make whole any employees or other persons who lost benefits as the result of the . . . repeal of Ordinance 96-54. . . ."
The City proceeded to file a Complaint in the Nature of an Application pursuant to § 28-9-18 to Vacate and Stay Arbitrator Denaco's Award as well as a Motion to Stay the implementation of the Denaco Award until such time as this Court rules on the City's Complaint. On April 14, 2004, this Court entered an Order staying the implementation of the Denaco Award pending its ruling on the merits of the City's appeal.
 STANDARD OF REVIEW
Judicial authority to review or vacate an arbitration award is limited. Rhode Island Council 94, AFSCME, AFL-CIO v. State, 714 A.2d 584,587 (R.I. 1998). An arbitration award may be vacated when the arbitrator manifestly disregarded the law or the contract, or when the arbitration award was completely irrational. Prudential Property and CasualtyInsurance Co. v. Flynn, 687 A.2d 440, 442 (1996). As long as the award "draws its essence" from the contract and is based upon a "passably plausible" interpretation of the contract, it is within the arbitrator's authority, and not subject to vacation by the Court. Jacinto v. Egan,391 A.2d 1173 (R.I. 1978). Grounds for vacating an award are provided by statute in § 28-9-18.
 "(a) In any of the following cases the court must make an order vacating the award, upon the application of any party to the controversy which was arbitrated:
(1) When the award was procured by fraud.
 (2) Where the arbitrator or arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was not made.
 (3) If there was no valid submission or contract, and the objection has been raised under the conditions set forth in § 28-9-13.
 (b) A motion to vacate, modify, or correct an arbitrator's award shall not be entertained by the court unless the award is first implemented by the party seeking its vacation, modification, or correction; provided, the court, upon sufficient cause shown, may order the stay of the award or any part of it upon circumstances and conditions which it may prescribe.
 (c) If the motion to vacate, modify, or correct an arbitrator's award is denied, the moving party shall pay the costs and reasonable attorneys' fees of the prevailing party."
An arbitrator may exceed his or her powers, thereby requiring a court to vacate an arbitration award that fails to "draw its essence" from the collective bargaining agreement or is not based upon a "passably plausible" interpretation of the same. R.I. Brotherhood of CorrectionalOfficers, 707 A.2d 1229, 1234. Therefore, a court may vacate an award where the arbitrator manifestly disregarded a contractual provision, reached an irrational result, R.I. Council 94, AFSCME, AFL-CIO,714 A.2d at 588, disregarded clear-cut contractual language, or attributed to the language "a meaning that is other than that which is plainly expressed." State v. R.I. Employment Security Alliance, Local401, 840 A.2d 1093, 1096.
A party asserting that the arbitrator has exceeded his or her authority bears the burden of proving this contention. Coventry Teachers' Alliancev. Coventry Sch. Comm., 417 A.2d 886, 888 (R.I. 1980). In such a case, "every reasonable presumption in favor of the award will be made." Id.
Furthermore, "the statutory authority to vacate an arbitration award where the arbitrators exceeded their powers does not authorize a judicial re-examination of the relevant contractual provisions. State, Dep't ofMental Health, Retardation, and Hosps. v. R.I. Council 94, A.F.S.C.M.E.,AFL-CIO, 692 A.2d 318, 323 n. 11 (R.I. 1997) (internal quotations omitted).
 ARBITRABILITY
The City urges this Court to overturn the arbitrators' awards on the basis that the arbitrators failed to adhere to the language of the applicable collective bargaining agreements. In support of its position, the City directs the Court's attention to the first section in each of the relevant collective bargaining agreements. Section 1 of the Police Officers' CBA provides as follows:
Section 1 — Recognition
 The City hereby recognizes and acknowledges the I.B.P.O. as the sole and exclusive bargaining representative for all full-time police officers, up to and including police officers holding the rank of Captain for purposes of collective bargaining and entering into agreements relative to wages, rates of pay, and other terms and conditions of employment.
 The words `member', and `member of the bargaining unit', `employee', `officer', `patrol officer', `personnel', and/or `police officer' (or plurals thereof) when used in this Agreement shall mean all of the officers described in the preceding paragraph. Those officers holding the positions or ranks of Chief of Police or Major effective July 1, 2000 will be excluded as a member of the bargaining unit.
Similarly, Section 1 of the Fire Fighters' CBA provides as follows:
Section 1 — Recognition
 The City of Cranston recognizes Local 1363 International Association of Fire Fighters, AFL-CIO as the exclusive bargaining agent for all uniformed employees and all full-time civilian employees of the Cranston Fire Department including the Assistant Chief, Deputy Chiefs, City Fire Marshal, Superintendent of Fire Alarms and Director of Emergency Medical Service for the purpose of collective bargaining relative to wages, salaries, hours and working conditions. . . . The rights of the City of Cranston and employees shall be respected and the provisions of this Agreement shall be observed for the orderly settlement of all questions.
According to the City, the arbitration awards ignore the plain language of the aforementioned sections of the CBAs, which limit membership to "full time" employees. The City contends that because the repeal of Ordinance 96-56 and Ordinance 96-54 only affected employees who retired prior to November 1996 and before the ordinances were enacted, the repeal of the ordinances is consistent with the terms of the collective bargaining agreements. Accordingly, the City maintains that the Unions have no standing to represent retirees as a result of an alleged violation of the collective bargaining agreements, when the pertinent provisions in the collective bargaining agreements were executed after the individuals had already retired from their employment with the City.
In reaching a decision on this matter, this Court is guided by both federal and state law addressing parties' bargaining rights in collective bargaining agreements regarding employment. In Allied Chemical AlkaliWorkers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.,404 U.S. 157, 166, 92 S. Ct. 383, 391, 30 L. Ed. 2d 341, 350 (1971), the United States Supreme Court held that the collective-bargaining obligation extends only to the terms and conditions of employment and that the term "employees" does not include retirees under the National Labor Relations Act. The Court reasoned that "[s]ince retirees are not members of the bargaining unit, the bargaining agent is under no statutory duty to represent them in negotiations with the employer." Id.
at 182 n20, 399 n20, 359 n20. Despite this finding, however, the Court went on to state,
 "This does not mean that when a union bargains for retirees — which nothing in this opinion precludes if the employer agrees — the retirees are without protection. Under established contract principles, vested retirement rights may not be altered without the pensioner's consent. Id.
Based on the Supreme Court's decision in Allied, it is clear to this Court that parties to a labor contract are free to bargain over the rights and/or benefits of retirees. Furthermore, under Allied, once the parties have made the active decision to bargain over the rights and/or benefits of retirees, the parties cannot circumvent the contractual obligations they have incurred as a result of their collective bargaining.
Since the Supreme Court's decision in Allied, the Federal Circuit courts have been consistent in holding that the right of a union to bargain with an employer over the benefits of its retirees is a permissive bargaining issue subject to arbitration. In United Steelworkersof America, AFL-CIO v. Canron, Inc., Warren Pipe Foundry Division,580 F.2d 77, 80-81 (3rd Cir. 1978), the Third Circuit held that the plaintiff union had standing to represent retirees in seeking arbitration under a labor contract. The Court reasoned that if the employer contractually agrees in a labor contract to afford certain benefits to the union's retirees, "then the union has a legitimate interest in protecting the rights of the retirees and is entitled to seek enforcement of the applicable contract provisions." Id. The Court observed,
 "Even though retirement benefits of former employees already retired are not a mandatory subject of collective bargaining, `it does not naturally follow, as the company implies, that a union loses all interest in the fate of its members once they retire.'" Id. at 81.
Similarly, in Local 589, International Ladies' Garment Workers' Union v.Kellwood Company, 592 F.2d 1008 (8th Cir. 1979), the Eighth Circuit held that a dispute over pension benefits for two former employees, brought by the Union, was an arbitrable dispute subject to the labor contract's arbitration clause. The Court noted that,
 "whether a dispute arises or rights accrued during the effective period of a labor contract does not necessarily determine arbitrability. Rather, where the parties have agreed to arbitrate all disputes requiring interpretation of a collective bargaining agreement, the question of arbitrability focuses upon whether the disputed obligation was arguably created by that agreement." Id. at 1011-12 (citing Nolde Brothers, Inc. v. Bakery Confectionary Workers' Union, 430 U.S. 243, 97 A. Ct. 1067, 51 L. Ed. 2d 300
(1977))
Because the employing company in Local 589 assumed certain obligations in its collective bargaining agreement with respect to the pension benefits of these former employees, the Court found that arbitration was appropriate in order to determine the scope of the company's obligations created by the agreements. Id. at 1012.
Moreover, the Rhode Island Supreme Court's decision in Fraternal Orderof Police v. Town of Westerly, 659 A.2d 1104 (R.I. 1995), recognizes that collective bargaining over an escalator clause for all retirees is permissible under Rhode Island law. That case pertained to a municipal union and a dispute with the Town as to the inclusion of a cost of living adjustment in a private pension plan. Id. at 1105. The arbitration panel in that matter awarded the pension escalation clause that the union was proposing to all of the town's police retirees regardless of the date they retired. Id. The town sought to have that portion of the award vacated on the basis that retirees were no longer members of the bargaining unit and therefore not represented by the union. Id. Rejecting the town's argument, our Supreme Court noted that, "[i]n Rhode Island both the General Laws and decisional law explicitly authorize the modification of pension benefits" and that "an arbitration panel may adopt a cost-of-living increase for retired police officers when consistent with the state statute." Id. at 1105-06. The Court went on to declare, "The interest arbitrators for the parties can do anything that the parties could have agreed to do." Id. at 1106.
In the present case, it is indisputable that the relevant parties agreed to bargain over retiree benefits. Here, the City and Unions made a joint decision to contract on the permissive subject of retirees' pension benefits. Mayor Traficante in his unrebutted testimony admitted that he sent notice to the respective bargaining representatives for the police and fire unions that their municipal pension systems were in financial crisis. Additionally, he testified that both the police and fire unions entered into "voluntary negotiations with the City regarding retirement benefits in an effort to relieve the City's financially strained police and fire pension system." Although the City was not obligated to bargain on the subject of benefits for all existing retirees, the Mayor, for better or worse, chose to bargain on this permissive subject. The impetus for entering this previously uncharted territory was the Unions' assent to placing all new hires in the State pension system as opposed to the City's private pension system, commencing July 1, 1995. Pursuant to their bargaining, the City and the Unions agreed to include all retirees in the amended escalation clause. As Arbitrator Denaco declared when issuing his award:
 "The very benefits [the City] talks about are in the contract . . . Once those benefits were carried over to and appeared in the CBA, they became subject to the grievance and arbitration provisions of the contract under Articles/Sections 22 and 23. The issue of whether the retired employees were ever `vested' with these `additional' and `gratuitous' benefits is immaterial; starting in 1994-97 . . . and continuing through the current CBA, these benefits were a matter of contract." (Denaco Award at 17).
It is apparent to this Court that the City cannot now abandon its contractual duties to provide retirees with the pension benefits it promised in collective bargaining agreements because the City regrets its decision to bargain on this matter.
Furthermore, this Court finds the City's reliance on Webster v.Perotta, 774 A.2d 68 (R.I. 2001), unavailing. In Webster, the Rhode Island Supreme Court heard an appeal by the Town of Johnston from several default judgments that had been entered in favor of four retired police officers who had received disability retirement pensions from Johnston.Id. The Supreme Court vacated substantial portions of the default judgments, noting that G.L. 1956 § 45-19-1 provided benefits only "to police officers, firefighters and other public safety personnel who are actually employed when they suffer the disability and are paid the compensation provided by the [injured-on-duty] statute." Id. at 80. The Court went on to state that § 45-19-1 is not a retirement act and is applicable only to the public safety personnel enumerated in the statute who are "`regularly employed at a fixed salary or wage' and does not include retirees of these departments." Id. at 81.
In citing Webster for support, the City overlooks an important distinguishing factor that sets Webster apart from the case at hand — that being the collective bargaining agreement between the parties. Like the parties in Webster, the parties in the present case were under no obligation to bargain over retiree benefits. However, once the parties in the instant case decided to bargain on this matter and make it a part of their contractual agreement, the City incurred an obligation that was not present in Webster. In his award, Arbitrator Altman observed:
 "The contention, as now argued by the City, that providing the benefits of the escalation clause to officers who retired before November 1996, was a gratuitous action by the City that could later be unilaterally rescinded, is wrong. A review of the transcript and the statements of Mayor Traficante and his Director of Administration made to the Cranston City Council in August of 1995, demonstrate that the effort to change the existing pension program was a process of mutual negotiations between the police and fire unions. Moreover, the transcript shows the City's intent as to why it agreed to provide the escalation benefits to those officers already retired." (Altman Award at 15).
In retrospect, this action by a previous Mayor and City administration was arguably ill-conceived and detrimental to the long-term fiscal health of the City. However, on the facts before the Court, a promise is a promise — notwithstanding the adverse and unforeseen consequences associated with it. Consequently, this Court is constrained to find that the arbitrators' decisions — both of which declare the City's repeal of retirees' benefits violative of the respective collective bargaining agreements — are rational and draw their essence from the agreements between the parties. Accordingly, any modification of retirees' benefits must be accomplished through collective bargaining.
 Conclusion
For the foregoing reasons, this Court denies the City's motions to vacate the arbitration awards in this matter.
Council shall prepare a judgment for entry in conformity with this decision.
[1] Section 24 of the relevant CBA, which concerns pension benefits, provides in pertinent part:
 "All City ordinances, state statutes and current benefits now in existence as evidenced by a memorandum of understanding signed by the City and IBPO, [sic] providing the various forms of retirement benefits in existence upon the execution of the Agreement for members of the bargaining unit are hereby incorporated by reference as if fully stated herein and shall inure to all members of the bargaining unit for the duration of the Agreement. No changes shall be made to said benefits without the written agreement between the City and the I.B.P.O."
[2] Section 24 of the relevant CBA, which concerns pension benefits, provides in pertinent part:
 "All retired employees' pension payments will automatically escalate based on any and all contractual increases received by active duty employees of similar rank or position and similar credited years of service with regard to weekly salary, longevity pay, and holiday pay. In any contractual year in which the active employee's over three (3) years of service weekly salary does not increase by a gross of three (3%) percent, the retired employee's escalation of pension payments will automatically increase by (3%) percent compounded on July 1 of that year. All active duty employees when retired shall have their pension payments adjusted, if necessary, to pension payments received by retired employees of similar rank or position and similar credited years of service at the time of their retirement."
[3] These two matters have been consolidated, as both arbitration decisions reach the same result, and involve the same question of law. The sole issue for this Court to resolve is whether or not the arbitrators reached a rational result in finding that the repeal of these two ordinances violated the parties' collective bargaining agreements.